374 So.2d 1293 (1979)
Bennie DAVIS
v.
STATE of Mississippi.
No. 51377.
Supreme Court of Mississippi.
September 19, 1979.
James D. Bell, Jackson, for appellant.
A.F. Summer, Atty. Gen., by Carolyn B. Mills, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, BROOM and COFER, JJ.
COFER, Justice, for the Court:
Defendant-appellant Bennie Davis was indicted of the crime of forgery by the Grand Jury of the Circuit Court of the First Judicial District of Hinds County. On trial, he was convicted and received a sentence of fifteen years.
On appeal here, he has assigned and argues two errors:
1. The trial court's denial of his motion for mistrial; and
2. The trial court's refusal to provide him, an indigent, necessary funds to procure an expert in questioned documents to counter the expert testimony of the state's witness.
In the state's case, defendant was accused of procuring a blank check of the lady for whom he was part-time yard man, after which he forced his niece to fill in the front of the check and write the employer's name on the signature line. After thus doing, he carried the check to a drug store and procured cash on it, then paying his niece $3. The niece testified to her participation in the crime. The lady who cashed the check at the drug store testified to his cashing it and receiving the proceeds. D.F. Clark, detective in the check forgery section, testified that he showed the check to appellant and appellant said it was given him by his employer, and that he endorsed and cashed it at the drug store. His employer denied writing the check, pointing out the glaring *1294 misspelling of her name. The handwriting expert was sure about some of the handwriting, but not positive as to part of it.
In considering the first assignment of error, that the court erroneously denied his motion for mistrial, we observe at the outset that it is apparent that, on voir dire of the jurors, appellant's attorney made some reference to the defendant's earlier involvement with law violations. With this statement, we quote lengthily from the record on which appellant bases prejudicial error in the trial.
Josephine Montgomery, appellant's niece, who wrote the front of the forged check, was testifying, when the following took place on direct examination:
"And he [appellant] had some blanks and asked me to fill out one."
"And what did you do?"
"I did it."
"Why did you do it?"
"I was scared of him. I had saw him in some acts of violence. I had seen him sometimes when he broke out my mother's windows and kicked the door in."
BY MR. BELL: "Your Honor, I object to this."
BY THE COURT: "Just a minute. The jury will disregard any testimony of this witness in regard to any other possible criminal acts."

* * * * * *
"Okay. Now, why did you make that check out to Bennie Davis?"
"I was scared of him. When he first got out of prison, we were all glad to see him and stuff."
BY MR. BELL: "We again object to this testimony, Your Honor."
BY THE COURT: "Yes, the jury will disregard the last remark that the witness made in reference to other previous charges."
BY MR. BELL: "At this time, Your Honor, I will have to move for a mistrial because of the statement that the witness has made."
BY THE COURT: "Motion overruled."

* * * * * *
"Do you know where he cashed that check, please, ma'am?"
"He had said he was going to the bank  to the bank."
"Did he say why he didn't want to go to the bank, please ma'am?"
"Yes, sir. When he was in Parchman, they gave him ____"
BY MR. BELL: "Again, Your Honor, we object and move for a mistrial."
BY THE COURT: I am going to ask the jury to step in the jury room." (Jury out). "All right, Mr. Bell."
BY MR. BELL: "Your Honor, I am forced under the circumstances to move for an immediate mistrial on the grounds that the witness has referred to the defendant, Bennie Davis, getting back from Parchman. An objection was made. ..."
BY THE COURT: "(Interposing) Her statement was on getting out of prison."
BY MR. BELL: "Getting out of prison, yes, and an objection was made and the Court instructed the jury to disregard the statement of the witness and you overruled that and now she has repeatedly said that. This jury has been tainted irreparably and the very fact that I have had to make an objection as reason for a mistrial has surely tainted this jury. At this point, after the witness has been instructed not to testify about that, I have no choice but to move for a mistrial immediately."
BY MR. MARTZ: "Your Honor, if I may, please. First of all, this witness has the right to state why she went ahead and did certain things and to cut off this witness from stating that this defendant had put her in some fear of her life, her child's life or whatever, would cut this witness off from telling her story in our search for truth. Secondly, the words that he did not want to go to the bank because he had a Parchman ID, which was what she was getting at, are words that he used. That's *1295 why he did not want to go to the bank. Now, to say that this witness cannot repeat the words that this defendant used in the furtherance of this crime would be prejudicial to the State and also to the rights of this witness to tell her story, Your Honor."
BY MR. BELL: "Your Honor, by the argument that the prosecution has just made, I say that there has been an intentional act to bring this witness in here to prejudice this defendant before the jury before the proper time. He asked this question specifically and, by the answer he was expecting, I think it's obvious to the Court and everyone else that he intended for this witness to say that he had a Parchman ID and didn't want to go to the bank and that was an intentional act on the part of the prosecution and that is further grounds for an immediate mistrial, Your Honor."
BY THE COURT: "Which exception are you referring to, Mr. Martz? I want to make sure I understand."
BY MR. MARTZ: "Which what?"
BY THE COURT: "Which exception?"
BY MR. MARTZ: "I am referring to both of them, Your Honor."
BY THE COURT: "Well, it's a general rule that it cannot be brought out about other crimes on the part of the defendant."
BY MR. MARTZ: "There hasn't been any other crimes brought out."
BY THE COURT: "He didn't go to Parchman as a guard, did he, Mr. Martz?"
BY MR. MARTZ: "Well, no, Your Honor, he didn't, but he didn't go for a specific crime. If I was to argue to the jury, what crime would I argue to the jury even though he has been convicted. There has been no evidence of any specific crime."
BY MR. BELL: "But it's purposely elicited testimony that this man had been to Parchman and it has been brought out after you have already sustained the motion to strike that sort of testimony. It was purposely elicited, Your Honor."
BY THE COURT: "I am accepting the fact that Mr. Martz did not deliberately do so but the first time she used prison and I felt that. ...

* * * * * *
BY THE COURT: "... and I was under the opinion at that time when she referred to prison that the jury could relate it to the statements made in voir dire to them by the defense attorney that the defendant had convictions  or I believe it was convictions  but that he had been in trouble with the law for drunkenness. The use of the word Parchman raises another problem. I intend to instruct the jury to disregard it. The motion for a mistrial will be overruled. Bring the jury back in.
BY THE COURT: "Members of the jury, this witness has inadvertently stated or referred to the fact that, when her uncle got out of prison and got out of Parchman  this is inadmissible evidence and is not to be considered by you in determining the guilt or innocence of Mr. Davis on this particular charge that he is standing trial for today. Do each of you tell me that you can set that aside and erase that from your mind as far as deliberation on this particular charge? I would like to see an affirmative nod of the head from all of you."
(He was apparently satisfied all nodded yes.)
Motion for mistrial was made after lunch break, because of what Attorney Martz said, "Why did Bennie kill his wife?"
Martz explained it his way, and then the court polled the jurors on whether anybody talked or attempted to talk to them or if they overheard any remarks of attorneys or witnesses. None had.
When the state rested, defendant again moved for directed verdict which was overruled.
"I would also renew our earlier motion for a mistrial on the grounds of introduction of evidence of a prior record of the defendant." (Emphasis added throughout).
Appellee contends that the statements as to appellant's violent actions and his imprisonment were voluntary, and were not responsive to the prosecuting attorney's questioning, *1296 and that whether a mistrial will be ordered in such case is largely addressed to the court's discretion, and only when the court is of the view that, on account of such testimony, an impartial verdict could not be reached or a conviction would have to be reversed due to an overwhelming procedural error. Appellee cites, as authority, McNeal v. Hollowell, 481 F.2d 1145 (5th Cir.1973), and 98 C.J.S. Witnesses § 353, p. 74 and 356, p. 79. It points out other authorities dealing with gratuitous remarks by prosecuting witnesses, these being from Louisiana. Appellee urges that the trial court was entirely correct in refusing mistrial on account of the unsolicited comment, which "if error at all, and appellee thinks it was not, surely it was harmless."
We strongly disagree. It is apparent that the state, resorting to the use of highly leading questions, was obviously undertaking to make clear to the jury:
(a) The fact of Josephine Montgomery's fear of defendant; and that this fear was generated by his acts of violence in damaging his sister's house - - - a likely criminal act in itself; and
(b) Defendant's criminal record, which was admissible only for impeachment purposes when and if he took the stand. Mississippi Code Annotated, sections 13-1-11, and 13-1-13 (1972).
It is obvious that her references to prison and Parchman were neither gratuitous nor unresponsive. When the witness Montgomery said defendant was going to take the check to the bank, the attorney asked her why he did not want to go to the bank. Earlier in her testimony, she had said, "I was scared of him. I had saw him in some acts of violence. I had seen him sometimes when he had broke out my mother's windows and kicked the door in," and after the court had instructed the jury to disregard any testimony by the witness in regard to any other possible criminal acts, the witness was asked the question, "Okay. Now, why did you make that check out to Bennie Davis?", and answered, "I was scared of him... ."
It might be contended that when appellant was placed on the stand, the error in the testimony as to his imprisonment and parole became harmless.
In Scarbrough v. State, 204 Miss. 487, 37 So.2d 748 (1948), the defendant, on trial on a charge of burglary, testified in his own behalf. In the state's testimony, over repeated sustained objections, the state, through what appeared to this Court in that case to be eager witnesses, succeeded in getting before the jury an implication that Scarbrough's nephew had implicated him, Scarbrough, in the theft of a radio, a happening wholly unrelated to the charge on which he was being tried. It was said by the Supreme Court:
It is permissible when one accused of crime has taken the witness stand in his own behalf for the prosecution to question him in regard to previous convictions of crime, but it is not competent for the state, in presenting its case in chief, to prove that a defendant has been convicted or is guilty of other crimes wholly disconnected with, and having no direct bearing on, the case under investigation. (204 Miss. at 496, 37 So.2d at 750).
The Court then narrated further the courtroom proceedings, and held:
After the city marshal had volunteered the statement that the defendant "was implicated in the radio stealing, too," and the Court had sustained an objection thereto, the witness continued to get it before the jury that the defendant had stolen the radio, based on hearsay statements of his nephew who was in jail. For instance, a witness stated, "We questioned him. His nephew had done told us ..." Then an objection was made as to "what somebody told us" and the objection was overruled. The witnesses thereafter continued throughout the trial to tell about the defendant having stolen a radio and to inform the jury that they "picked up" the defendant because of what his nephew had told them instead of introducing the nephew as a witness, if indeed his testimony as to this separate offense would have been competent if called as a witness.

*1297 This is not one of those cases for the application of the rule that a conviction will be affirmed unless it appears that another jury could reasonably reach a different verdict upon a proper trial than that returned on the former one, but rather it is a case where the constitutional right of an accused to a fair and impartial trial has been violated. When that is done, the defendant is entitled to another trial regardless of the fact that the evidence on the first trial may have shown him to be guilty beyond every reasonable doubt. The law guarantees this to one accused of crime, and until he has had a fair and impartial trial within the meaning of the Constitution and Laws of the State, he is not to be deprived of his liberty by a sentence in the state penitentiary. (204 Miss. at 496-497, 37 So.2d at 750).
It should be said there was testimony relative to a confession by Scarbrough and whether it was coerced by punishment inflicted upon him and whether or not he was "sassy and impudent" to the officers.
We more recently, in Gray v. State, 351 So.2d 1342, 1345 (Miss. 1977), held that proof that defendant was on parole was another way of proving he had been convicted of another crime, and said in part:
It is well settled in this state that proof of a crime distinct from that alleged in an indictment is not admissible against an accused. (351 So.2d at 1345).
We noticed that Gray did not testify in the guilt phase of the bifurcated hearing, and, therefore, he was not subject to impeachment.
It is our opinion that the conviction in this case cannot be said to be the result of a fair and impartial trial, and the cause should be reversed and remanded for a new trial.
The second and remaining assignment of error should be noticed. Appellant made a timely request for funds to obtain a handwriting expert who might counter the one offered by the state. He was never able to inform the court as to the cost of such service. He had had contact with such an expert, but the expert could give no approximation of his charges unless or until he could examine the original document. He took the position that, being an indigent, he should be furnished with such witness, or, if not, then the prosecution should not be permitted to use its expert. He argued that, under the Sixth Amendment to the United States Constitution, and Article 3, Section 26 of the Mississippi Constitution (1890), he was entitled to process for such witness, and, in order to procure one prepared to meet his needs, fee was necessary, the provision of which should be borne by the public.
He has cited Bradford v. U.S., 413 F.2d 467 (5th Cir.1969), in support of this assignment, which decision however, says:
The government's case against Washam depended almost entirely upon the testimony of the two experts. It was therefore necessary, if Washam was to combat this evidence, that he have the assistance of other handwriting and fingerprint experts. (413 F.2d at 474).
(Rule 28, Federal Rules of Criminal Procedure, provides for the appointment of expert witnesses and for their compensation.)
In People v. Watson, 36 Ill.2d 228, 221 N.E.2d 645 (1966), likewise cited by appellant, it is said:
Whether it is necessary to subpoena expert witnesses in order to assure a fair trial will depend upon the facts in each case... . (221 N.E.2d at 648).
We do not enter this field of inquiry to make the determination that the state owes to the indigent the duty of providing an expert as a part of due process to which the defendant is entitled, for, as stated in the Watson case, supra, the decision should be on a case by case basis, and, unlike the Bradford case, supra, the guilt or innocence of the defendant was scarcely, if at all, dependent on the state's expert witness, and also for reasons next to be noticed.
In Phillips v. State, 197 So.2d 241, 244 (Miss. 1967), the defendant, an indigent accused of assault and battery with intent to kill, moved for the appointment of a psychiatrist *1298 to evaluate his mental condition, and, in affirming the denial thereof, this Court said:
Neither the United States Constitution nor the Mississippi Constitution requires that the nation or state furnish an indigent defendant with the assistance of a psychiatrist. The only assistance that they require is the assistance of legal counsel. (Emphasis added). (197 So.2d at 244).
In King v. State, 210 So.2d 887 (Miss. 1968), it was held an indigent defendant is not entitled to have at public expense, a psychiatrist of his choice to aid in his defense, that, when mentality is brought into consideration under section 2575.5, Code of 1942 [now Mississippi Code Annotated section 99-13-11 (1972)] the court has the right to select the psychiatrist upon whom it is to depend. On habeas corpus, this decision was upheld in King v. Cook, 297 F. Supp. 99 (N.D., Miss. 1969).
In Laughter v. State, 235 So.2d 468 (Miss. 1970), we held that the defendant was not entitled to a private investigator and a chemist at state expense, where the defendant was being charged with possession of marijuana.
In Bright v. State, 293 So.2d 818 (Miss. 1974), wherein the defendant charged with selling marijuana, asked to be furnished, at public expense, an expert chemist to examine the substance involved, an extensive review was made of cases wherein the services of experts in various fields were sought to be provided, after which the lower court's denial of the expert witness request was affirmed.
We conclude that denial of the services of a handwriting expert was proper and not error.
This case was considered by a conference of the Judges en banc.
REVERSED AND REMANDED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and WALKER, BROOM and LEE, JJ., concur.
BOWLING and SUGG, JJ., dissent.
LEE, Justice, concurring:
I concur in the majority opinion. It is said that the undisputed facts, as shown by the record, indicate the attorney for the accused, on voir dire examination, told the entire jury panel that the accused had prior convictions, and that the reason to so inform the jury was to ascertain whether or not those prior convictions would influence them in the trial of the case. The record is absent the voir dire examination and the only indication therein that the appellant's attorney voir dired the jury on appellant's criminal record is in the following statement of the trial judge in sustaining the objection:
"BY THE COURT:
 and I was under the opinion at that time when she referred to prison that the jury could relate it to the statements made in voir dire to them by the defense attorney that the defendant had convictions  or I believe it was convictions  but that he had been in trouble with the law for drunkenness. The use of the word Parchman raises another problem. I intend to instruct the jury to disregard it. The motion for a mistrial will be overruled. Bring the jury back in." (Emphasis added)
The trial judge's statement reflects only that the attorney made references to the fact that appellant had been in trouble with the law for drunkenness. In my opinion, such statements do not sufficiently remove the taint of prejudice from the State's chief witness (Josephine Montgomery) that appellant had been in Parchman (state penitentiary). At the outset, appellant's attorney, knowing that the testimony would show appellant was intoxicated at the time of the commission of the alleged offense, may have desired to ascertain whether or not the fact that he frequently became drunk would influence their verdict. He may have decided, after the State rested, that he would not place the appellant on the stand, if the Parchman sentence had not been injected into the trial. At the conclusion of the State's case, appellant's attorney *1299 moved for a mistrial because of the Parchman testimony and stated that he was forced to put the appellant on the stand due to the same. Although the trial judge sustained objections to persistent questions by the State resulting in the Parchman references, and instructed the jury to disregard such testimony, under the record, I cannot say that the statements constituted harmless error. Prosecuting attorneys should be aggressive, but they must be fair in the prosecution of an accused, and they must present cases in accord with the rules of evidence. If they do not, and by their fault put the trial court in error, even though the court does all in its power to correct same, the case must be remanded for a proper trial.
It is also said that the statements of the witness were admissible because she gave the reason for writing the spurious check, that appellant was a violent person and that he had been in prison. If such statements were admissible, under the guise of fear, any defendant's criminal record could be put into evidence by the prosecution, who only would have to ask a witness in the witness room whether she was afraid of the defendant because of his violence or previous criminal record. If the question were answered in the affirmative, when the witness was asked on the trial why she did something, that which had been implanted in her mind during conference would be stated by her in open court.
Trial judges should see that a complete record is made in the trial of a criminal case from the time the panel is placed in the box until the judgment is entered. With such a record, this Court can determine for itself whether or not things were done, or not done, which would result either in a reversal or affirmance of the judgment.
SMITH, P.J., joins in this opinion.
BOWLING, Justice, dissenting:
I respectfully dissent. In my opinion in this case, the Court is acting as a trial court rather than an appellate court. We decide cases solely on the printed record, exhibits, the briefs filed by attorneys and arguments of attorneys on behalf of the parties. The trial court makes his decisions during the actual trial of the case. He is in a position to observe the witnesses, the attorneys, and communicate directly with the jury. Unless his decisions are in violation of the law, he should have wide discretion in determining whether the accused is granted a fair trial.
The majority of the Court is reversing the present case solely because a nineteen-year-old, obviously uneducated, niece of the defendant made statements during her testimony that conveyed to the jury that the accused had a prior record of criminal convictions.
At the outset we are met with the undisputed fact as shown by the record that the attorney for the accused, prior to the start of the trial, told the entire jury panel that the accused had prior convictions. There is only one reason to so inform the jury prior to trial and that is to ascertain whether or not those prior convictions would influence their opinion in the present case. Of course, if any member of the jury panel indicated that such would be the case, he or she promptly would have been excused.
The majority opinion reversing the case is based on three separate answers of the thirty-year-old appellant's niece. She had related about the appellant bringing blank checks to her while he was intoxicated and demanding that she fill them out for him. On being asked why she did so, the witness merely related her reason, that is, she was "scared" of appellant as she had witnessed acts of violence on his part before.
The second answer of the niece on which the majority based its reversal was in answer to the question as to why the check was made out to "Bennie Davis." The answer told why  she was scared of him because he had been in prison.
The third answer of this witness on which the case is being reversed came about after she described how the appellant came to her house, intoxicated, with a bottle of wine, and knocking real loud. According to her testimony, appellant told her he did not *1300 want to go to a bank with the forged check because of his Parchman record.
We repeat that these three incidents during the trial are the sole reasons for the majority reversing the case. We also repeat that prior to these incidents and prior to the start of the trial, the jurors hearing the case were told by the appellant, through his attorney, that he had prior convictions.
The trial judge, in his wisdom, and correctly so, told the jury that regardless of anything else they should not consider the three answers given by the niece. All jurors agreed with the court that each would abide by his instructions.
I do not think the responsive answers of the niece as to why she completed the checks on demand of her intoxicated thirty-year-old uncle were anything but what should have been expected. She was merely stating why she performed the demanded acts, and the reason was her fear of appellant because of his prior actions. Repeating, appellant, through his attorney, had already told the jury about the convictions.
Appellant's defense was that he found the checks in the owner's garage while working around the house. Admittedly appellant did not have to testify in the case. It is readily apparent, however, that he intended to do so as his attorney knew that if he testified the law and court procedure permitted the prosecution to ask about any prior conviction of a felony or misdemeanor. This, of course, was the reason appellant's attorney brought the subject up with the jury prior to the start of the trial. During appellant's testimony it was brought out that prior to his trial for the present charge on April 5, 1978, at age thirty, he had been convicted of manslaughter, burglary, trespass, carrying concealed weapons (more than once), resisting arrest, and seven or eight drunk convictions. He had served time for at least two of the convictions. It is obvious why his attorney wanted to secure assurance from the jury prior to trial that they would not consider his prior convictions in the present case.
No member of the judiciary wishes to insure a fair trial of every accused more than I. I am of the opinion that the appellant had such a fair trial and unhesitatingly state that no reasonable jury could have returned any verdict other than guilty.
I reiterate for the purpose of clarification my original premise. I believe the trial judge should have the authority to preside over the trial and insure a fair trial so long as he does not make legal errors that prejudice the accused. In the present case, the trial judge made every effort possible and everything was done to ascertain that the appellant secured a fair trial. Unfortunately, the appellant was not such a defendant as most trial attorneys would feel secure in representing. The court, jury and attorneys have to take accused persons as they are and not what they would like them to be.
This Court has rules under which it operates. Rule 11 provides:
No judgment shall be reversed on the ground of misdirection to the jury, or the improper admission or exclusion of evidence, or for error as to the matter of pleading or procedure, unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice.
In my humble opinion, in addition to what I have heretofore said, this rule should be applied for two main reasons. In the first place, appellant, through his attorney, was the first one to mention his prior convictions, and did so before the actual trial started. The answers of the niece were legitimate answers to questions asked, which mainly in effect were, "why did you do it?", referring to why she completed the checks for appellant's endorsement. She merely made inadvertent answers further elaborating on what the jury had already been told. In the second place, as hereinbefore stated, without all of the answers objected to by the majority and not considering them, the jury had no other recourse. There were witnesses other than the niece to prove the State's case. One of their witnesses was a handwriting expert to prove appellant's endorsement of the check. *1301 Positive identification of appellant was made by the clerk at the drug store where the check was cashed.
I am reluctant to repeat the statement, but as said at the outset, I do not approve of this Court acting as a trial court rather than leaving the trial to the trial judge unless he commits a clearly reversible error that prejudices the accused. I do not think that the trial court did so in the present case.
SUGG, J., joins in this dissent.