453 So.2d 337 (1984)
Donald William DUFOUR
v.
STATE of Mississippi.
No. 55053.
Supreme Court of Mississippi.
June 6, 1984.
Rehearing Denied July 25, 1984.
*338 F. Kent Stribling, R.L. Houston, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by William S. Boyd, III and Marvin L. White, Jr., Sp. Asst. Attys. Gen., Ed Peters, Jackson, for appellee.
EN BANC.
BOWLING, Justice, for the Court:
Appellant Donald William Dufour was indicted by the Grand Jury of the First Judicial District of Hinds County for the crime of capital murder of Earl Wayne Peeples. The indictment charged that Peeples was killed while Dufour was engaged in the commission of the crime of robbery, the alleged offense having occurred during the early morning hours of October 14, 1982. In a bifurcated trial, the jury found appellant guilty of capital murder and, after a sentencing hearing, the jury found that appellant should be sentenced to death. Other than hereinafter discussed corroborating evidence, the principal evidence submitted by the state to the jury was that of Robert Taylor, an admitted companion of Dufour, who, according to his testimony, engaged in the murdering activities when Peeples and another man named King were killed with knives and screwdrivers.
Taylor's testimony revealed that he and Dufour arrived in Jackson around midnight on October 13, 1982. Dufour was driving and Taylor had been asleep for a number of hours on the back seat of the vehicle. They had come from Florida by way of Georgia. According to Taylor, when he awakened, the car was in front of what was reputed to be a "gay bar" named "The Other Side Lounge." Dufour preceded Taylor into the bar. When Taylor went therein, he was informed by Dufour that they were going to rob two men. They were pointed out to Taylor by Dufour and later developed to be Peeples and King. Shortly after 1:00 a.m., the four hereinbefore described individuals, along with a 16-year-old male, who had accompanied Peeples and King to the bar, drove away in Peeples' car to what is known as Windsor Park Apartments on West Capitol Street in Jackson. When the group reached the apartment complex, the sixteen-year-old male, who lived with his family in the complex, went directly to his home. One item of corroborating evidence was the testimony from this sixteen-year-old regarding his accompanying Peeples and King to the bar and his returning with them and Dufour and Taylor to the apartment complex. He positively testified that the four were on the way to Peeples' apartment when he left them to go to his family's apartment.
Taylor then testified in much detail, the majority of which we shall not repeat here. As soon as the four men entered Peeples' apartment, they began undressing. Taylor decided to go into the apartment kitchen and look for weapons to use in the robbery. He found knives and screwdrivers in drawers. Then, in order to create a diversion, he threw a mug of water against the wall and broke it. Upon Peeples and King entering the kitchen, a knife was given to Dufour by Taylor. Dufour then grabbed Peeples and Taylor grabbed King. According to Taylor, he saw Dufour immediately stab Peeples at least three times in the chest. Taylor was stabbing King in the chest with a screwdriver.
After it appeared Peeples and King were dead, Dufour instructed Taylor to take a shower to remove the blood on him. This Taylor did, after which he saw that the pockets of Peeples' pants had been turned wrong side out and that appellant Dufour was placing articles on a bedspread and folding the bedspread so that it could be carried.
*339 Shortly before Peeples received the stabbing blows from Dufour, Taylor heard Dufour demand information as to the location of Peeples' money. Taylor heard him tell Dufour that it was in the trunk of his car.
Dufour and Taylor left the apartment, got in Peeples' car and drove away. About a mile from the apartment complex they were on what is known as Dixon Road, when Dufour told Taylor, who was driving, to pull off the road to ascertain what they had. Taylor pulled off too far and the car became stuck in the wet ground. It could not become unstuck. Dufour then opened the trunk of the vehicle and stated that he found nothing of value therein. Dufour then took the folded up bedspread across and down Dixon Road and put it in a ditch. He then instructed Taylor to go back to the apartment complex and secure the car owned by King that was parked there. Taylor was on the way back to the apartment, walking at a fast pace or running on West Capitol Street, when he was observed by a city policeman. Taylor was stopped by the patrolman, who was suspicious of Taylor hurrying along Capitol Street on a cool night, barefooted and wearing no other clothes, except pants. Taylor was taken to the city jail, where it was ascertained that he was wanted in Florida for the alleged crime of armed robbery. He was therefore held in jail.
It suffices to say that a reading of Taylor's testimony shows a very detailed account of the events leading up to and surrounding the murder of Peeples, whom Dufour is accused of killing.
Evidence from the Jackson Police Department reveals that during the early morning of October 15, they were contacted by members of King's family with information that he could not be found by them, but that they understood he was supposed to visit Peeples in Jackson. Policemen went to the Windsor Park Apartments and found King's car parked in the parking lot of the apartment complex. They then contacted the manager, who opened the Peeples' apartment door and found the two bodies and the situation that existed in the apartment when, according to Taylor, he and Dufour left. The police conducted their usual on-site investigation duties through the crime lab, including taking photographs.
From the history of the place and the manner of Taylor's arrest on the early morning hours of October 14, the police questioned him in a proper manner, and he admitted his involvement in the murder. It should be stated here that during all of the time involved in the history of this cause, subsequent to Taylor's arrest, he was represented by a court-appointed, competent and reputable attorney.
Corroborating evidence included the testimony of police officials, who found Peeples' car where it was stuck on Dixon Road and who also found the folded up bedspread, which revealed that everything had been removed therefrom except for one penny.
We need briefly to discuss the evidence presented by the appellant Dufour. He testified that after staying in the gay lounge for a relatively short time, he went to the car that was parked on the street nearby, got on the backseat and went to sleep. He stated he did not wake up until sometime the next morning. He did not have means to drive the vehicle, as Taylor had the keys. After waiting most of the morning for Taylor to appear, Dufour stated he went to McDonald's and ate a hamburger. He then secured a paper shopping bag from a store and went back to the car. After putting some pants and shirts in the shopping bag, together with a "scuba diving knife", he found a run-down boarding house in the area and arranged to stay there and receive board and lodging, if he would take care of an aged invalid, who resided at the house. According to Dufour, the next day he read in the newspaper about Taylor having been arrested. He then learned that Taylor had implicated him in the homicides.
Dufour then testified that after learning of his being wanted, he went to a barber school and had his normally black hair dyed blonde and cut shorter, explaining that he *340 was on parole and was in the wrong state and therefore did not want to be arrested. He stayed in seclusion at the boarding house until the night of October 29, 1982, when a young acquaintance invited him to go to the same gay bar, where the acquaintance would buy him some beer. They went to the bar and while there, at about 11:30 p.m. Dufour was arrested by city policemen.
One Roger Harris related during the course of the state's evidence the manner in which Dufour's identification and arrest took place. Harris was a part-owner and the security guard at the lounge. He testified that he was present on the night of October 13 and the early morning hours of the 14th, when Taylor and Dufour were there. According to Harris, he had to call Dufour down on more than one occasion for improper conduct and had occasion to talk with Dufour.
On the night of October 29, Harris, while close to Dufour, recognized Dufour's voice as one he had heard before and identified him in his own mind as Dufour, even though his hair had been dyed. Harris called the police and managed to keep Dufour occupied until the police arrived.
The defendant introduced evidence from a lady who worked in a business establishment next door to the gay bar. She testified that on the early morning of October 14, she saw a young man asleep on the back seat of a strange car with Georgia license plates parked in front of the business. She observed the young man get out of the car on occasions during the course of the morning and sit in the car for periods of time as if he were waiting for someone.
Appellant submits seven assignments of error as follows:
I. THE TRIAL COURT ERRED IN REFUSING THE APPELLANT'S REQUEST TO HIRE AN INVESTIGATOR.
II. THE TRIAL COURT ERRED IN EXCUSING FOR CAUSE JAMIE HONEYCUTT BECAUSE OF HER BELIEFS REGARDING THE DEATH PENALTY.
III. THE TRIAL COURT ERRED IN EXCUSING FOR CAUSE PAMELA SUMMERS IN VIOLATION OF THE WITHERSPOON RULE.
IV. THE TRIAL COURT ERRED IN REFUSING TO EXCLUDE GERALD H. BAGWELL FOR CAUSE.
V. THE TRIAL COURT ERRED IN ADMITTING CERTAIN PICTURES DEPICTING THE DECEASED IN GRUESOME ASPECT, WHICH PICTURES WERE CUMULATIVE, AND NO OTHER PURPOSE THAN TO INFLAME THE JURY AGAINST THE DEFENDANT, AND CONNECTED THE DEFENDANT WITH ANOTHER CRIME FOR WHICH HE WAS NOT BEING TRIED.
VI. THE TRIAL COURT ERRED IN ADMITTING PICTURES OF SCREWDRIVERS NOT USED IN THE COMMISSION OF THE CRIME.
VII. THE STATE FAILED TO PROVE THE ESSENTIAL ELEMENTS OF THE CRIME OF ROBBERY.

ASSIGNMENT OF ERROR NO. I.
Appellant, through his attorneys, filed a motion requesting the state to furnish funds to hire an investigator to aid in the preparation of appellant's defense. An evidentiary hearing was had on this motion. An investigator was presented as a witness, who testified that an investigation involving such a charge as that against appellant would cost somewhere between $2,000 and $6,000.
The motion was overruled by the trial court. In overruling the motion, it was stated that all the motions and arguments requested a "carte blanche" authority to hire an investigator. A reading of the motion and evidence shows nothing concrete in the way of investigation that had been planned either in Mississippi or Florida. No proposed names, locations or investigative possibilities were pointed out to the court. The hearing revealed nothing that was unusual to any other charge similar to that against appellant.
*341 In Davis v. State, 374 So.2d 1293 (Miss. 1979), we held that the determination of furnishing the indigent accused any expert, other than psychiatric or other mental experts, would be made on a case by case basis. This was reiterated in Bullock v. State, 391 So.2d 601 (Miss. 1980). Other jurisdictions have held that an accused is not entitled to an investigator at public expense. See Hager v. State, 665 P.2d 319, (Ok. 1983); People (of the State of Illinois) v. Veal, 110 Ill. App.3d 919, 66 Ill.Dec. 679, 443 N.E.2d 605, (Ill. App. 1982), State v. Carroll, 629 S.W.2d 483 (Mo. App. 1981).
There is no merit to Assignment of Error No. I.

ASSIGNMENTS NO. II AND III.
Under Assignments No. II and III, appellant contends that the lower court committed reversible error in refusing two jurors for cause; namely, panel jurors Jamie Honeycutt and Pamela Summers. We first discuss Jamie Honeycutt. The voir dire examination of the jury panel consumes 210 pages of the record before us. On the 166th page, we first find reference to Ms. Honeycutt. Needless to say the court and the state at that point had extensively examined the prospective jurors on a number of subjects, both general and specific. At the time Ms. Honeycutt appears in the picture, the topic involved whether or not each juror could return a death penalty verdict in the bifurcated trial when the guilt of the accused was based almost exclusively on the testimony of a co-perpetrator of the alleged murder. The district attorney had completed interrogating one jury panel member, when the record shows he, for the first time, addressed Ms. Honeycutt by saying "I am going to wait you out now, Ms. Honeycutt." Any member of the bar, experienced in courtroom observations, knows that some action of Ms. Honeycutt not shown in the record, resulted in this type of introduction to Ms. Honeycutt. Whatever that was is not material, except to emphasize that the interrogation of Ms. Honeycutt was being conducted by the state in regard to the extent of evidence she would require before returning a death penalty verdict.
In answer to the district attorney's statement, Ms. Honeycutt said, "I would have to have a lot of evidence before giving somebody the death penalty." The next question by the district attorney was, "Do you feel that probably you could not vote for the death penalty based on a co-defendant's testimony?" Ms. Honeycutt answered "Right." Then the district attorney said, "Thank you for your honesty, ma'am."
The only other time that Ms. Honeycutt appears in the picture is after 185 pages of the voir dire. At this point, the record clearly shows that the individual jury panel members were being interrogated regarding accusations of crime against members of their families or close friends. This specific interrogation had been going on for a number of pages. Ms. Honeycutt was reached on this point and the following occurred:
BY MR. PETERS: Mrs. Honeycutt.
BY THE COURT: First of all, Mrs. Honeycutt, just tell me who it was that was charged or convicted of an offense and what relationship were they to you.
BY MRS. HONEYCUTT: It was just a friend. It was George Malvaney.
BY THE COURT: And where did this take place?
BY MRS. HONEYCUTT: In New Orleans.
BY THE COURT: Do you know anything about the facts and circumstances surrounding the charge.
BY MRS. HONEYCUTT: A little bit, not much.
BY THE COURT: Do you know whether or not he committed the offense?
BY MRS. HONEYCUTT: He didn't.
BY THE COURT: He did not?
BY MRS. HONEYCUTT: No, sir.
BY THE COURT: Was he found guilty or not guilty?
BY MRS. HONEYCUTT: He was found guilty.

*342 BY THE COURT: And to your knowledge, he did not commit the offense.
BY MRS. HONEYCUTT: Right.
BY THE COURT: I assume that would affect you. As a result of that, do you have any hard feelings concerning law enforcement or our prosecutors, or our judicial system?
BY MRS. HONEYCUTT: Well, it was in New Orleans. The Court was in New Orleans, so to New Orleans, I do.
BY THE COURT: But it wouldn't affect you regarding Mr. Peters or law enforcement in Hinds County.
BY MRS. HONEYCUTT: No, sir.
BY THE COURT: Mr. Peters, do you have any questions?
BY MR. PETERS: What was he charged with?
BY MRS. HONEYCUTT: He was part of the Bayou of Pigs in New Orleans.
BY MR. PETERS: Was that that thing where they were going to take that country over?
BY MRS. HONEYCUTT: Yes, sir.
BY MR. STRIBLING: And what is your name, ma'am?
BY MRS. HONEYCUTT: Jamie Honeycutt.
BY THE COURT: Is he presently confined, ma'am?
BY MRS. HONEYCUTT: No, sir, he's out now.
BY THE COURT: Is he in New Orleans or Mississippi?
BY MRS. HONEYCUTT: He's in Mississippi again.
BY MR. STRIBLING: And what was his name again?
BY MRS. HONEYCUTT: George Malvaney.
BY MR. PETERS: Did you say they released him?
BY MRS. HONEYCUTT: Yes.
BY THE COURT: You could be a fair and impartial juror in this case and that would not affect you?
BY MRS. HONEYCUTT: No, sir, it wouldn't.
BY MR. STRIBLING: If it goes to the penalty phase, you could consider life or death as a penalty?
BY MRS. HONEYCUTT: Yes, sir.
The established law on this assignment of error raised by appellant shall be discussed later. We should emphasize the situation regarding Ms. Honeycutt before going further.
Ms. Honeycutt obviously was interrogated only during the voir dire questions involving two specific situations. That is, (1) if the case presented by the state is based on a co-defendant's testimony, or (2) if prior experience with criminal charges against family members or friends would keep that juror from being properly qualified. As above shown, in the first situation Ms. Honeycutt stated positively and without reservation that she would not base a death verdict on the testimony of a co-defendant.
Under the second appearance of Ms. Honeycutt, she was being questioned only about prior experience of a friend tried under a charge growing out of the "Bayou of Pigs" incident. These questions were being asked by the court and by the state, at the end of which appellant's attorney asked Ms. Honeycutt, "If it gets to the penalty stage, you could consider life or death as a penalty?" It is readily apparent that the construction of this layman's answer meant that she would only "consider" "life or death". It in no way stated that she, in answer to the questions under the subject being discussed, could grant a death penalty. She already had said positively that she would not vote for the death penalty under the state's evidence. While being questioned about her friend's trouble with the courts, she merely said that she could "consider life or death." This could only be interpreted as in effect saying, "Yes, I will `consider' both but it will be life." The trial court cannot be faulted for not pursuing further this one injected question and answer. She already had made her position clear.
At the time the jury was being selected, the state requested that Ms. Honeycutt be excused for cause based upon her stating *343 that she could not vote for the death penalty based on the testimony of a co-defendant regardless (emphasis supplied). The trial court excused Mrs. Honeycutt for cause for that reason only. So as not to be repetitious, we will not discuss the authorities here, but state that in our opinion it is clear that the second appearance of Ms. Honeycutt in no way overcame or interfered with her positive statement that she would not vote for the death penalty in a case where the state relied primarily on the testimony of a co-defendant as developed in this case. The Witherspoon question is not involved. There is only involved the positive statement that she would not vote for the death penalty under the proof to be developed in this case.
Going to the jury panel member Pamela Summers, she first appeared when the court was questioning the panel. The following occurred:
BY A JUROR: Pamela Summers. If I were on the jury and I didn't know they were going for the death penalty and I said guilty, you know, that would be okay. But I don't think I would like to sit on a jury where I know that they were going for the death penalty.
BY THE COURT: Before you sit down, ma'am, just let me ask you a further question. As I understood what you said to me, you wouldn't have a problem sitting on the jury to determine the guilt or innocence of this Defendant but did I understand you to say that you would have difficulty 
BY MRS. SUMMERS: I wouldn't have difficulty in deciding the guilt or innocence, but I would have 
BY THE COURT: Let me stop you a moment. Did you say you would have difficulty in deciding his guilt or you would not have difficulty?
BY MRS. SUMMERS: I would not have.
BY THE COURT: And what would you have difficulty with, ma'am?
BY MRS. SUMMERS: I wouldn't have any difficulty. I'm just saying that I would not like to sit on a jury that's going for the death penalty.
BY THE COURT: But let me ask you this question, ma'am. Although you have these feelings, would you nevertheless be able to sit and follow the testimony and the evidence in the case and deliberate and return a verdict, although you know that verdict might result in the death penalty?
BY MRS. SUMMERS: Yes, sir.
BY THE COURT: You would do that.
BY MRS. SUMMERS: Yes.
BY THE COURT: Thank you ma'am. Have I covered everybody?
(NO RESPONSE FROM ANY JUROR.)
During the voir dire of the panel by the state, the following occurred as to Mrs. Summers:
BY MR. PETERS: Thank you. Mrs. Summers is that your response also; that you could never personally vote for the death penalty?
BY MRS. SUMMERS: That's right.

BY MR. PETERS: Under any circumstances?
BY MRS. SUMMERS: I wouldn't like to.
BY MR. PETERS: Well, nobody has to like what we do. It's a matter of whether you would follow the law if that was one of your options.
BY MRS. SUMMERS: Yes, sir.
BY MR. PETERS: In not liking to do that, would you put an unreasonable burden on the state in proving its case of guilt or innocence?
BY MRS. SUMMERS: Well, it wouldn't affect the decision of if he was guilty or innocent. It wouldn't affect that.
BY THE COURT: Let me get you to stand, ma'am. I'm having trouble hearing you.
BY MR. PETERS: It wouldn't affect your decision of guilt or innocence.
BY MRS. SUMMERS: Right.
BY MR. PETERS: A good way to get out of doing something you wouldn't like *344 to do is just not have to do it, and so if you vote not guilty, you don't have to consider voting for the death penalty or not.
BY MRS. SUMMERS: I wouldn't do that though.
BY MR. PETERS: Another good way of getting out of having to do something you don't want to do is just not do it. If you don't like to vote for the death penalty, you just don't do it. Would that be your position?
BY MRS. SUMMERS: Part of it.
BY MR. PETERS: Would you take the position of, "I don't like the death penalty and I wouldn't like to sit on the jury involving the death penalty, so I just won't vote for the death penalty"? You're being honest now and I'm not trying to put you in any position. I've got to know an honest answer, the Court's got to know an honest answer, and the record's got to know an honest answer. Honestly, would you vote for the death penalty?

BY MRS. SUMMERS: No.

On voir dire examination by the attorney for appellant, we find the following in regard to Mrs. Summers:
BY MR. STRIBLING: And now, Mrs. Summers, I'll ask you the same question. If you are selected as a juror and this case goes in to penalty phase, can you consider the death penalty and the life penalty, one of the two?
BY MRS. SUMMERS: Probably life.
BY MR. STRIBLING: I beg your pardon.
BY THE COURT: You'll have to speak up, ma'am.
BY MRS. SUMMERS: Probably life.
BY MR. STRIBLING: I'm not asking you probably now. I'm asking you could you consider, after hearing the evidence and the law as given to you by His Honor, either life or death as a penalty? Could you do that? I'm not asking you if you will give life or give death. I'm asking you if you could consider the penalty of either life or death in the second phase of the trial, if it goes to the second phase of the trial?
BY MRS. SUMMERS: You mean one or the other?
BY MR. STRIBLING: I beg your pardon?
BY MRS. SUMMERS: You mean could I give one or the other?

BY MR. STRIBLING: That's correct. Could you consider one or the other?
BY MRS. SUMMERS: Yes.

It is, therefore, inescapable that Mrs. Summers made the positive and unequivocal statement that she would not vote for the death penalty. When first asked this she gave an unequivocal "No," as shown above. Further to the prior question "Mrs. Summers, is that your response also; that you could never personally vote for the death penalty?" Mrs. Summers answered, "That's right."
Appellant's attorney attempted to rehabilitate Mrs. Summers and toward the end, in answer to the question "Could you consider one or the other?" Mrs. Summers' only answer was "Yes," after asking "you mean could I give one or the other?" This answer certainly did not state that she would consider "both life or death." It only stated that she would consider one or the other, which according to her previous positive answers was life only.
Under this assignment of error regarding the above discussed two jurors, appellant relies on the bellwether case of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). They also cite the fairly recent case of Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The court further spoke in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
The principles announced in Witherspoon, supra, have been discussed in a large number of cases, both federal and state. Undoubtedly, Witherspoon set out in clear language that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the *345 death penalty or expressed conscientious religious scruples against its infliction.
In examining the above cited cases, we find a number of clarifications of Witherspoon, which clarifications have been carried over as stated in federal and state cases. In Lockett, supra, the United States Supreme Court in discussing Witherspoon went further and stated:
We specifically noted, however, that nothing in our opinion prevented the execution of a death sentence when the veniremen excluded for cause make it "unmistakably clear ... that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."
In Adams, supra, the Court, after discussing Lockett, supra, said:
This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court. (Emphasis added).
We specifically note the post-Witherspoon cases of the Fifth Circuit; namely, O'Bryan v. Estelle, 714 F.2d 365 (5th Cir.1983); Porter v. Estelle, 709 F.2d 944 (5th Cir.1983); Bell v. Watkins, 692 F.2d 999 (5th Cir.1982); and Williams v. Maggio, 679 F.2d 381 (5th Cir.1982). A reading of the opinions in the above Fifth Circuit cases clearly bears out our holding here that there is no reversible error as a result of the trial judge excusing for cause either juror Honeycutt or juror Summers.

ASSIGNMENT NO. IV.
Appellant contends that the trial court erred in refusing to excuse juror Bagwell for cause. The sole reason was that on voir dire examination, he, in answering a specific question about news coverage, stated that on the morning of the trial there was an article in the local morning paper stating that appellant's case would be tried that day. The trial court and the attorneys thoroughly examined this prospective juror as to whether or not that news article would influence him. A reading of the questions and answers of this prospective juror [who did not serve] clearly shows no prejudicial error. His answers reveal that he had just glanced over it and remembered no specifics of the article. It is interesting to note that other prospective jurors answered the same as Bagwell, but were not challenged. One of those actually served. There is no merit to this assignment.

ASSIGNMENT NO. V.
Appellant contends that the trial court erred in admitting photographs made of the conditions existing in Peeples' apartment when they entered on the morning of October 15. These pictures included the bodies of Peeples and King and showed the entrance of knife and screwdriver stabs inflicted on the bodies.
All courts are frequently presented with the age-old question as to when photographs should be admitted or excluded. All cases have held that this primarily is a question for the trial court to decide in its discretion, considering all other elements existing and surrounding the trial in its court. Bullock v. State, 391 So.2d 601 (Miss. 1980); Irving v. State, 361 So.2d 1360 (Miss. 1978); and Mallette v. State, 349 So.2d 546 (Miss. 1977); and many others. We have carefully examined the photographs in question, all of which were made as stated at the scene. We find without reservation that the lower court did not abuse its discretion in permitting a jury of grown laymen to see them, specifically when considering the testimony of Robert Taylor, one of the alleged killers.

ASSIGNMENT NO. VI.
One of the photographs made in the apartment after the bodies were found was *346 of two screwdrivers lying on a counter. Appellant contends that the introduction of this photograph, along with the other photographs, was error. Appellant contends that it was not shown that these instruments were used in the crime, although the bodies admittedly bore screwdriver stab-related marks. We decide this assignment of error in the same manner as Assignment No. V. It is only a continuation of that argument and our decision thereon. If anything, the photographs would aid appellant by showing that Peeples and King had screwdriver weapons in the house in an amount exceeding that necessary for usual household use. Furthermore, the picture verifies Taylor's testimony that he looked through the drawers and secured articles that could be used as weapons. The introduction of this photograph was not reversible error.

ASSIGNMENT NO. VII.
Appellant contends that the case allegedly against Appellant Dufour was not capital murder as the murder was not committed during the course of a robbery, as charged. We disagree.
See Voyles v. State, 362 So.2d 1236 (Miss. 1978); Shanklin v. State, 290 So.2d 625 (Miss. 1974); and Thompson v. State, 258 So.2d 448 (Miss. 1972). In Shanklin, supra, we stated:
"Intent to do an act or commit a crime is also a question of fact to be gleaned by the jury from the facts shown in each case. The intent to commit a crime or to do an act by a free agent can be determined by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent." (citations omitted).
We need only to refer to what heretofore has been set out regarding the evidence by the state. When Taylor went into the lounge, Dufour pointed Peeples and King out to him and stated that they were going to rob the two men. Dufour and Taylor went with Peeples and King to Peeples' apartment, after that intent was made known. Both Peeples and King were cold-bloodedly murdered without any inkling in this record for any reason other than taking what they had. There is no indication whatever of animosity  just cold-blooded murder. Peeples' pants' pockets were turned out. Dufour placed articles in a bedspread and placed them in Peeples' car. Peeples' car was taken away after Peeples had told Dufour, immediately prior to being stabbed, that his money was in the trunk of the car. As soon as practical, the trunk was searched by Dufour, trying to find the alleged money. The articles were taken from the rolled up bedspread [except for a penny] and taken by Dufour. What other evidence is needed for a jury to find that the cold-blooded murder was done to effect a robbery? We also note the definition of robbery as set out in Mississippi Code Annotated, Section 97-3-73 (1972), which states as follows:
Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.
We find no error in the trial of the guilt phase of the bifurcated trial of appellant and therefore are required to affirm the jury's verdict and the resulting finding of appellant guilty of capital murder.

PENALTY PHASE
Appellant propounds no argument regarding alleged errors in the sentencing phase of the bifurcated trial. He testified in person during the guilt phase and relied on that testimony in the sentencing phase. The evidence submitted by both the state and appellant was reintroduced during the sentencing phase. Admittedly, the instructions given by the court to the jury in the sentencing phase were proper and contained no error.
The jury found that the capital murder was performed during a robbery for pecuniary gain and the murder was especially heinous, atrocious and cruel. An examination *347 of the record before us reveals that it would be hard to find a murder that was more heinous, atrocious or cruel.
This Court, after hearing oral arguments, while sitting en banc, has fully reviewed the record and briefs as required by MCA § 99-19-105 (Supp. 1983), and have fully reviewed the imposition of the death penalty of the jury. In reviewing the sentence of death, we particularly have considered it as to whether or not the verdict was a result of the influence of passion, prejudice or any other arbitrary factor. We find unhesitatingly that those elements do not exist.
We further have reviewed the jury's findings regarding the aggravating circumstances that (1) the capital offense was committing while the defendant was engaged in the commission of robbery for pecuniary gain and (2) the capital offense was especially heinous, atrocious and cruel. As hereinbefore discussed, which we are here adopting, there is an abundance of evidence to sustain both findings.
We have considered the appellant's sentence of death as to whether or not it is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We have considered prior capital murder cases resulting in the death penalty and affirmed or reversed by this Court and find without hesitation that the death penalty sentence in the case sub judice is not excessive or disproportionate to the penalty imposed in those cases.[1]
After full consideration of the death penalty verdict and judgment thereon, fully considering everything required by the statutes of this state and the prior decisions of the Courts, both state and federal, we find that the evidence presented as a result of appellant's indictment for capital murder fully justified the finding that he committed a gruesome and horrible murder and under all statutes and prior court opinions, his sentence of death should be and is affirmed.
AFFIRMED AND WEDNESDAY, JULY 11, 1984, IS FIXED AS THE DATE ON WHICH THE DEATH SENTENCE SHALL BE EXECUTED, AS PROVIDED BY LAW.
PATTERSON, C.J., AND WALKER AND ROY NOBLE LEE, P. JJ., AND HAWKINS, DAN LEE, PRATHER, AND SULLIVAN, JJ., CONCUR. ROBERTSON, J., NOT PARTICIPATING.

APPENDIX "A"
DEATH PENALTY CASES AFFIRMED BY THIS COURT:

Neal v. State, 451 So.2d 743 (Miss. 1984).

Booker v. State, 449 So.2d 209 (Miss. 1984)

Wilcher v. State, 448 So.2d 927 (Miss. 1984)

Caldwell v. State, 443 So.2d 806 (Miss. 1983)

Irving v. State, 441 So.2d 846 (Miss. 1983), and 361 So.2d 1360 (Miss. 1978)

Tokman v. State, 435 So.2d 664 (Miss. 1983).

Leatherwood v. State, 435 So.2d 645 (Miss. 1983).

Hill v. State, 432 So.2d 427 (Miss. 1983).

Pruett v. State, 431 So.2d 1101 (Miss. 1983).

Gilliard v. State, 428 So.2d 576 (Miss. 1983).

Evans v. State, 422 So.2d 737 (Miss. 1982).

King v. State, 421 So.2d 1009 (Miss. 1982).

Wheat v. State, 420 So.2d 229 (Miss. 1982).

Smith v. State, 419 So.2d 563 (Miss. 1982).

Edwards v. State, 413 So.2d 1007 (Miss. 1982).

Johnson v. State, 416 So.2d 383 (Miss. 1982).

Bullock v. State, 391 So.2d 601 (Miss. 1980).

Reddix v. State, 381 So.2d 999 (Miss. 1980).

*348 Jones v. State, 381 So.2d 983 (Miss. 1980).

Culberson v. State, 379 So.2d 499 (Miss. 1979).

Gray v. State, 375 So.2d 994 (Miss. 1979).

Jordan v. State, 365 So.2d 1198 (Miss. 1978).

Voyles v. State, 362 So.2d 1236 (Miss. 1978).

Washington v. State, 361 So.2d 61 (Miss. 1978).

Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:

Dycus v. State, 440 So.2d 246 (Miss. 1983).

Edwards v. State, 441 So.2d 84 (Miss. 1983).

Coleman v. State, 378 So.2d 640 (Miss. 1979).
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:

Cannaday v. State, 455 So.2d 713 (1984).

Williams v. State, 445 So.2d 798 (Miss. 1984).

Wiley v. State, 449 So.2d 756 (Miss. 1984).
NOTES
[1] Cases reviewed are listed and attached hereto as Appendix "A" to this opinion.