529 So.2d 577 (1988)
Leon JOHNSON
v.
STATE of Mississippi.
No. 57526.
Supreme Court of Mississippi.
May 18, 1988.
*578 J. Richard Barry, Bourdeaux & Jones, Meridian, Joseph W. Hutchinson, III, Butler, Ala., for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Deirdre D. McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and PRATHER and GRIFFIN, JJ.
PRATHER, Justice, for the Court:
Leon Johnson, the defendant below, was tried on a capital murder indictment with an underlying crime of robbery and appeals his conviction of murder and life sentence in the Circuit Court of Lauderdale County. Venue was changed to Jackson County as a result of this Court's reversal of Johnson's conviction and death sentence on his first appeal. Johnson v. State, 476 So.2d 1195, 1198 (Miss. 1985) (hereinafter Johnson I). On this second appeal, three primary questions are raised: (1) discriminatory and unconstitutional jury selection by the State's exercise of peremptory challenges for the purpose of striking members of the defendant's race under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (2) interpretation of new Mississippi Rule of Evidence 609, when the trial court puts a time limitation on impeachment evidence of former convictions; and (3) the denial of funds to employ an independent fingerprint expert. However, Johnson assigns all of the following errors, most of which were previously assigned in Johnson I and rejected by this Court:
(1) The verdict of the jury as to guilty and sentence imposed is against the overwhelming weight of credible evidence, and there is insufficient evidence for the jury to base a finding of guilt and sentence beyond a reasonable doubt.
(2) The trial court erred in overruling the defendant's motion for directed verdict as to robbery.
(3) The trial court erred in denying the defendant's motion for directed verdict as to capital murder.
(4) The trial court erred in denying defendant's motion to strike and quash the unconstitutional Mississippi statutes providing *579 for the imposition of the death penalty in the application of this case.
(5) The trial court erred in overruling the defendant's motion to impanel a separate jury for the guilt and punishment phases of the trial.
(6) The trial court erred in denying defendant's motion for funds to hire an investigator to aid in preparation of his defense, which denied the defendant due process of law.
(7) The trial court erred in denying the defendant's motion for funds to employ an independent fingerprint expert, which denied the defendant due process of law.
(8) The trial court erred in denying the defendant's motion to restrict prosecutorial strikes.
(9) The trial court erred in failing to sustain the object of the defendant to quash the petit jury panel because the jury selection process exercised by the State was discriminatory and unconstitutional.
(10) The trial court erred in allowing into evidence Exhibits 28 and 29, and the testimony of State's witness Larry Turner concerning the human blood contained on said exhibits.
(11) The trial court erred in overruling defendant's motion in limine relating to fingerprints lifted from the door facing of the Super Stop containing human blood.
(12) The trial court erred in overruling defendant's motion to suppress a suggestive line-up and pictures thereof in which the defendant was a participant.
(13) The trial court erred in overruling defendant's motion to suppress statements given by the defendant to law enforcement agencies.
(14) The trial court erred in overruling defendant's motion to suppress and exclude certain illegally seized items and clothes taken from the home of the defendant's grandfather.
(15) The trial court erred in overruling defendant's motion to suppress evidence of fingerprints taken of the defendant.
(16) The trial court erred in granting instructions, C-12, C-15, C-17, C-34, C-37, C-51, C-52, C-53, and refusing all other instructions where said instructions did not contain the two theory instruction as the State's case was based solely upon circumstantial evidence.
(17) The trial court erred in imposing a time limitation and limiting the evidence the defendant could offer in impeaching State's witnesses Tommy Hill and Jack Amison as to their prior convictions.
(18) The trial court erred in refusing instructions of the appellant instructing the jury to find the appellant not guilty of capital murder and refusing to instruct them to find appellant not guilty.

I.
At the outset, several general observations need to be made. The evidence offered in the second trial was almost identical to that offered in the first. Furthermore, Johnson's assignments of error almost duplicate those in the first appeal.
The principles governing this situation may be drawn from West v. State, 519 So.2d 418, 424-25 (Miss. 1988), wherein this Court held that where a case has been reversed and remanded for a new trial, a trial de novo follows. Thus, on remand, where the defendant desires to introduce new evidence not considered at the first trial, the trial judge is required to permit a new evidentiary hearing. This is true even though the issue had been determined at the first trial, and this Court expressly affirmed the trial court's ruling on the first appeal.
On the contrary, however, this Court distinguished factually Jones v. State, 517 So.2d 1295 (Miss. 1987). In that case, the defendant incorporated a transcript of the suppression hearing at the first trial into the record of the second trial. The trial court correctly rejected the identical arguments on the same evidence at the second trial, this Court having decided the three specific issues in question adversely to the defendant. "The decision was based not upon the fact that the issues had been raised in a prior appeal, but because [the defendant's] arguments advancing the issues *580 were supported by the evidence and law argued and rejected in the first appeal." West, 519 So.2d at 425.
Turning to the case before this Court, it is noted that the only change in the evidence of any significance in the second trial is Johnson's personally testifying and denying any part in the crime and asserting an alibi. Fifteen of his eighteen assignments of error were decided adversely to Johnson on the first appeal. Johnson has admitted this fact, merely stating that he "resubmits those ... assignments of error, originally submitted, for further review." This Court holds the same to be res judicata and therefore does not address them again. West, supra.

II.
The facts of this case are now quoted from Johnson I, with certain changes at the second trial noted afterwards:
"On December 4, 1982, around 8:30 in the morning, the Super Stop convenience store located at the corner of Eighth Street and 29th Avenue in the City of Meridian, was robbed and Mrs. Eileen Grogan, the attendant, was brutally murdered. Her body was discovered in the back room of the Super Stop, nude from the waist down with her bra and shirt pulled up under her chin. The victim's underclothes were never located. According to the pathologist, who examined the body, Mrs. Grogan had been struck on the head with a blunt object causing a depression fracture to the skull. She had experienced sexual intercourse at some undetermined period of time prior to her death. The cause of death was established as strangulation.
"The Meridian Police Department received a call from a customer of the Super Stop, who had become suspicious, around 8:30 on the morning of the homicide, indicating to the police that a black male had waited on him; that the person didn't know how to use the cash register; and that he didn't know the prices of some of the merchandise. The first officer to arrive at the scene was Carl Molony. When he entered the store, the black male took the officer's gun and shot Molony twice with it, seriously injuring him. Molony managed to radio to the police department for more assistance, which was immediately forthcoming. The store was surrounded, tear gas was thrown into it, the fire department was called, and a hole was cut through a wall into the back room where Mrs. Grogan's body was found. Officer Molony survived the gunshot wounds inflicted on him, but was unable to remember what occurred.
... .
"Naomi Shadow testified that she bought a coke in the Super Stop between 8:00 and 8:30 on the morning of December 4, 1982. Ms. Grogan was there at the time, and Ms. Shadow did not see anyone else in the store. Kevin Bartley testified he went into the store at about the same time and Mrs. Grogan waited on him. He did not see appellant in the store.
"Herbert Smith entered the Super Stop prior to 8:30 that morning to buy beer for an elderly friend, who lived across the street. He identified appellant as the person who waited on him. Smith noticed that appellant had an orange Super Stop jacket draped over his right shoulder. There was blood on the jacket. When Smith paid for the beer, appellant stepped over to the cash register as if to open it, but didn't. He then stepped back and made the change out of a roll of money in his shirt pocket.
"After leaving, Smith watched the Super Stop from a window at his friend's house across the street. He saw Officer Molony go in and look around, but could not see appellant. Molony then opened the door and stepped into a back room. A few seconds later, he came `flying out backwards' from that room, appellant came out behind him, Smith heard two shots fired, and appellant left.
"Tommy Hill and his brother, Jack Amison, stopped at the Super Stop and Hill went in. There was no one in the store at the time. A policeman came in looking around. Hill lost sight of him when he went behind the counter. He then heard a shot and saw a tall black man leaning against the wall. While Hill was running out, he heard another shot. The gunman *581 followed him out and said, "You haven't seen me, man." Hill described that person as wearing a gray pullover sweater and gray pants. He then identified appellant as the man with the gun. Hill is a local bootlegger with numerous convictions for liquor violations. He did not come forward with his information until the end of January, 1983. The murder occurred on December 4, 1982. There was a large reward being offered by that time. Jack Amison did not go in the Super Stop, but heard gunshots and saw his brother, Tommy Hill, run out followed by appellant. He also identified appellant.
"Ricky Walters drove by the Super Stop that morning and saw an empty police car and a white truck. (Hill and Amison were driving a white truck), but no people. He kept driving down the street and a "kind of faded brown like" Torino pulled out in front of him. About that time, the rest of the police arrived on the scene.
Mitsi Harris worked in a sporting goods store down the street from the Super Stop at the time of the murder on December 4, 1982. She was looking out the window and saw a yellow car pull in the parking lot. A black male about 6' tall and wearing dark pants and a dark shirt got out and walked toward the Super Stop. She identified him as Johnson. Ms. Harris looked into the parking lot and saw that the car was a yellow Torino with Alabama plates. About 10 minutes later, several black males came running back by the window, but she was not sure if the first man was with them.
"Danny Brown, deputy sheriff, Choctaw County, Alabama, testified that on the morning of December 4, 1985, the sheriff's office received a call from the Meridian Police Department to be on the lookout for a yellow and black Torino with Alabama plates. He observed such a vehicle about 9:30, after stationing himself on the highway coming from Mississippi. He did not stop the car, however, because he recognized it as belonging to Fred Johnson (father of appellant) whom he knew well.
"Officers searched the Johnson home on December 21, 1982. Appellant, his father, Fred Johnson, grandfather, Amos Johnson, and his grandmother, all lived together. Taken in the search were a pair of gray wool pants, a grayish black knit pullover velour-type shirt, a pair of jeans, and two belts. These clothes were on a hanger inside a cleaning bag.
"George Reese, a local schoolteacher, testified that he met appellant on the street the night of December 3, 1982, and they slept in Reese's car that night. Appellant gave him his address and Reese gave appellant a false address. The address note was introduced in evidence. He also gave appellant $5.00. They woke up around daylight. Reese said that appellant was wearing a steel grayish-blue velour pullover sweater shirt and gray pants. He did not know appellant prior to that night. Although he claimed to have given appellant the money out of sympathy, it was indicated, during cross-examination, that the money was for sexual favors.
"Larry Turner, a forensic serologist with the Mississippi Crime Lab, determined from the semen recovered from the vaginal tract of Mrs. Grogan that it came from a person with Type B blood, secretor status. Appellant was found to be a Type AB, secretor status.
"Thirteen (13) latent fingerprints were lifted from the Super Stop and sent to the Mississippi Crime Lab. Only eight (8) of them were identified. One was identified by Ron Smith of the Mississippi Crime Lab to be appellant's fingerprint. It was found on a door facing inside the Super Stop. Smith testified that a red substance found on the print was blood, but he was unable to determine the type. Due to the manner the blood was on the ridges of the fingerprints, he was able to determine that the blood had been on appellant's hand when he touched the door facing, rather than the blood having been on the door facing when appellant put his hand on it. However, Smith was not able to determine when the print was made.
"Appellant's defense was an alibi. He did not refute that he was in Meridian on the night of December 3, 1982, but introduced evidence that he was at home in bed on the morning of December 4... .
*582 "Appellant's father, Fred Johnson, and grandparents testified that appellant was asleep at home early on the morning of December 4. Fred Johnson testified that he went to the town of Butler, Alabama, in the Torino car that morning. He left home between 8:30 a.m. and 9:00 a.m. Beatrice Phillips testified she rode with him and they left her house between 8:00 and 9:30.
"In addition to other shopping, Fred Johnson purchased some vodka for another person. His receipt from the liquor store indicated that he bought it at 10:15 on the morning of December 4... .
... .
"Christopher Chapman testified for the defense that he was a customer in the Super Stop on the morning of December 4; that a black male with a mole over his left eye and a gold earring waited on him; and that appellant was not that man. On cross-examination, he also said that the person was wearing gray pants and a short-sleeve gray pullover shirt.
"Paul Kidd, who originally alerted the police, testified for the defense. It was through Kidd's description that the officers were able to prepare a composite of the accused, which bore a striking resemblance of him, and from which at least one individual recognized appellant. Kidd said that the person who waited on him had a finger on his left hand which was tapered like it had been stuck in a pencil sharpener. Kidd testified that appellant was not the person who waited on him.
"Herbert Smith viewed a lineup in Butler, Alabama, on December 21, 1982, in which appellant participated. He positively identified appellant as the individual he saw in the Super Stop on December 4, 1982. Mitsi Harris identified appellant on December 22, 1982, from a photo lineup as the person she saw on December 4, 1982, who parked the Torino where she worked. These individuals made an in-court identification of appellant."
Johnson, 476 So.2d at 1198-1201.
Neither Johnny Crump nor Tommy Portis testified at the second trial, although both had testified for the defense at the first trial. Crump, a liquor store clerk, had testified in corroboration of Johnson's father's testimony that he bought liquor at the store. Crump had stated that the father was in his Torino but, on cross-examination, that he noticed the car in the lot at 8:30 that morning when he came to work. Portis had testified that he and Johnson had gone to Meridian and stopped at the Super Stop four days before the murder and that only Johnson had entered the store. Two police officers testified in rebuttal that Portis told them that he alone entered the store.
At the second trial, Beatrice Phillips testified for the defense that she rode to Butler, Alabama with Johnson's father, but could not remember what time, although it was after mail delivery, which occurred at 9:00 or 9:30 that morning, and that she returned home in the early afternoon. Charles Breeland testified for the defense that he saw Johnson's father's Torino in Butler between 12:00 and 3:00 o'clock. Also, Wade Roberts, the owner of a drycleaning establishment in Butler, testified that in December, 1982, the sheriff's department inquired whether he had any recollection of blood on clothing brought in my Johnson. Roberts replied in the negative.
Johnson himself testified at the second trial, denying that he murdered Mrs. Grogan and asserting that on the evening of December 3, he attended several nightclubs in Meridian, returned home to Choctaw County, Alabama between 3:00 and 4:00 o'clock the next morning, and went to bed at that time, waking at approximately 1:00 o'clock on the afternoon of December 4.

III.

DID THE TRIAL COURT ERR BY DENYING JOHNSON'S MOTION TO RESTRICT PROSECUTORIAL STRIKES AND BY DENYING THE MOTION OF JOHNSON TO QUASH THE PETIT JURY PANEL BECAUSE THE SELECTION PROCESS WAS DISCRIMINATORY AND UNCONSTITUTIONAL?
The defense contests the State's use of peremptory challenges as discriminatory based upon Batson v. Kentucky, supra. *583 Batson held that the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution forbids a prosecutor to peremptorily challenge potential jurors solely based on their race or on the assumption that black jurors as a group will be unable to impartially consider the prosecution's case against a black defendant.
The State used seven of its twelve peremptory challenges to strike five black and two white individuals from the jury panel, but did accept one black juror and one black alternate juror. The prosecutor stated his reasons for striking the five black individuals as follows:
The State ... would state to the Court that as to Richard Kelly ..., the voir dire was taken in its totality by the Court as to Juror Kelly it would show during voir dire that he is originally from Choctaw, Alabama, heard something or read something in the paper; and would show that the defendant and his family ... are from Choctaw County, the State felt that this juror could have been or possibly was tainted as to any information received. As to Juror .. . Street  reflect that in voir dire process upon questioning by the State specifically as to the issue of religion and judgment, his responses were non-committal. We see that at one point he stated that he could not vote for a guilty verdict upon the State's showing evidence if it were a death penalty case. In addition, I've learned from law enforcement in this area that there's a possibility that this man is involved in some criminal activity. As to Juror Eppes the court record will show that she responded to several questions in voir dire by the Court, also responded in non-committal fashion to the State's questions concerning different issues, particularly to the death penalty. In addition, when defense counsel voir dired her indicated that there was possibly a problem with her grandchildren or children or someone not being able to take care of her children during the  if she was sequestered as a juror, and that was the basis of striking Eppes.
Williams, due to Williams' age, due to Williams' non-answering, non-committal [responses] to the questions the State struck him. Also, due to his in and out of employment record I have notation of concerning that. The State struck Williams.
As to Juror Elder, the State struck Mr. Elder, showed that he was a parttime school teacher, his wife was a school teacher. The State would show that Juror Barbara Helen Allred was also a school teacher which the State struck. Also, show that Mrs. Glenn Seay is a school teacher which the State struck.
To constitute a prima facie showing of discrimination necessary to compel the State to come forward with a neutral explanation for challenging black jurors, a defendant must show that he is a member of a "cognizable racial group", that the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race, and that facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities. Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987).
As in Lockett, this Court need not now engage in a careful analysis of Johnson's zeal in raising this issue in light of the prosecutor's voluntary adherence to that part of Batson, supra, dealing with expression of his motives for minority challenges, but may assume for purposes of this case that a prima facie showing was made, triggering the mandate that the prosecutor present a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges. Id.
The determination of whether purposeful discrimination has been shown largely turns on credibility, and thus ordinarily a reviewing court should give the trial court great deference, defined as insulating from appellate reversal any trial findings which are not clearly erroneous. In sum, a trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are accorded great deference and will not be reversed unless they appear clearly erroneous *584 or against the overwhelming weight of the evidence. Id. at 1349-50.
Lockett cautioned that the prosecutor's explanation may not include his assumption or intuitive judgment that black jurors would be partial to the defendant because of their shared race. Id. at 1352. Finally, the prosecutor is not required to question prospective jurors about the racially neutral reasons later given, as long as the source of the information and the practice itself are not racially discriminatory. Id. at 1352-53. An appendix of racially neutral reasons upheld by other courts was included in Lockett as illustrative examples. Id. at 1353.
The defendant may rebut any prosecutorial explanations, if he is able to do so. Harper v. State, 510 So.2d 530, 532 (Miss. 1987); Williams v. State, 507 So.2d 50, 53 (Miss. 1987). This Court has since found significant the lack of any rebuttal by the defendant of the prosecutor's asserted reasons. Taylor v. State, 524 So.2d 565 (Miss. 1988). Because Johnson has offered no rebuttal, all that this Court has before it is the reasons asserted by the prosecutor. This Court now examines those reasons.
The record supports the reasons given for striking Kelly, a juror who had lived in the same Alabama county as the defendant. (It is interesting to note that Kelly also stated that two weeks before his wife had had a stroke which left her totally paralyzed on the right side so that being away from home would be a hardship and his wife's condition might prevent him from listening to the testimony with undivided attention.) Living near the defendant was a sufficient reason in Taitano v. State, 4 Va. App. 342, 358 S.E.2d 590 (1987). Such a reason is enhanced in a case such as this where there has been a change of venue because of the high amount of publicity. Kelly's statements of minimal knowledge of the case add to the reason of the prosecutor. Cf. Hughes v. State, 257 Ga. 200, 357 S.E.2d 80 (1987).
The prosecutor's statements, that Street gave non-committal responses as to religion and judgment and that, notwithstanding the State's evidence, he said he could not vote for a death penalty verdict, are supported in the record. The State's information from law enforcement as to the possibility of Street's involvement in criminal activity is not in the record, but again, it does not have to be. Lockett, 517 So.2d at 1352-53. As to Street's possible criminal activity, this Court upheld as a race neutral explanation the conviction of the brother of the potential juror in Lockett, 517 So.2d at 1351. Other similar reasons have been upheld as follows: The previous arrest of the juror, Yarbough v. State, 732 S.W.2d 86, (Tex. Ct. App. 1987); the potential juror's criminal record, People v. Cartagena, 128 A.D.2d 797, 513 N.Y.S.2d 497 (1987); the imprisonment of the juror's father, Williams v. State, 507 N.E. 2d 997 (Ind. App. 1987); the juror's friend having been charged with a crime, Smith v. State, 734 S.W.2d 694 (Tex. Ct. App. 1987); and the juror having two sons in trouble with the law, U.S. v. Forbes, 816 F.2d 1006 (5th Cir.1987). Street's statements appear to be a good example of the hostility to the prosecution spoken of in Lockett, 517 So.2d at 1351-52. (As to the non-committal responses, compare Townsend v. State, 730 S.W.2d 24 (Tex. App. 1987) (indefinite answer on juror's card).) Finally, Street's religious scruples about the death penalty are comparable to the race neutral reason for striking the minister in Lockett, 517 So.2d at 1351, that is, the perceived sympathy of ministers toward the accused. Scruples against the death penalty are clearly race neutral.
Next, Epps non-committal response as to the death penalty is supported by her statements that she would not want to vote for it. Her concern over care of her grandchildren is likewise supported in the record. Again Epps' death penalty scruples are clearly race neutral. These scruples coupled with the possibility of resentment as to care of the children are sufficiently race neutral reasons. In Lockett, it was sufficient reason that a prospective juror cared for her invalid mother, rolled her eyes to express her disapproval when denied excusal for this reason and thereafter became unresponsive. 517 So.2d at 1351.
*585 Williams' non-answering, non-committal responses are reflected by the court reporter's notations of "inaudible" and "shakes head negatively." This came in the context of Williams stating that he had been the victim of a theft. A prosecutor may sense by a juror's demeanor that he is hostile to being in court and thus fear that the juror might respond negatively to the prosecution simply because the government was responsible for calling him to jury duty. Id. Not only has this Court recognized demeanor as a race neutral reason, but so have others. Taitano, supra,; Yarbough, supra; Forbes, supra. In addition to demeanor, Williams' age and employment history reflect instability. Instability was held in Lockett to be a racially neutral criterion relevant to the prosecution as it would tend to produce a juror unsympathetic to the State. Age has been held to be a racially neutral reason by other courts. Taitano, supra; Chambers v. State, 724 S.W.2d 440 (Tex. App. 1987). Short-term employment and employment history have been held to be sufficient reasons. Townsend, supra; Cartagena, supra.
It is this Court's opinion that the prosecutor stated more than one sufficient race neutral reason for each of the above four prospective jurors. As to Elder, only one reason was stated. Elder was struck because he was a part-time school teacher, married to a school teacher, which facts are supported in the record. Not only his marriage to a teacher, but also the fact that the other two teachers were stricken, adds strength to the prosecutor's reason and shows consistency of action along racially neutral lines. But is the fact of being a school teacher a sufficiently race neutral reason? An Alabama court affirmed a case wherein one of the neutral explanations was that "she was a teacher and I know I strike all teachers. In all cases." Funches v. State, 518 So.2d 781, 783 (Ala. Cr.App. 1987). The Louisiana Supreme Court has accepted the reason that the prospective juror was a school teacher and the mother of four children which could have rendered her sympathetic to a young defendant. State v. Thompson, 516 So.2d 349, 354 (La. 1987). A Texas court upheld the reason that the prosecutor felt the prospective juror had an attitude toward police credibility that would be detrimental to the State's case since, as a teacher, she was accustomed to hearing excuses from her students. Rasco v. State, 739 S.W.2d 437, 439 (Tex. App. 1987).
Finally, as to all the prospective jurors in this case, it has been held that the fact that a prosecutor distrusts a juror is a sufficient race neutral reason for striking that juror. Rodgers v. State, 725 S.W.2d 477 (Tex. App. 1987).
The prosecutor had racially neutral explanations regarding his exercise of peremptory challenges. It is this Court's opinion that there is no merit to Johnson's Batson argument.

IV.

DID THE TRIAL COURT ERR IN IMPOSING A TIME LIMITATION IN LIMITING THE EVIDENCE THE APPELLANT COULD OFFER IN IMPEACHING STATE'S WITNESSES TOMMY HILL AND JACK AMISON AS TO THEIR PRIOR CONVICTIONS?
Jack Amison and Tommy Hill were the State's witnesses who identified the appellant as the man they saw running out of the Super Stop with a gun. The State requested the court to limit any cross-examination by the defense of any conviction of Hill or Amison outside Mississippi Rule of Evidence 609 due to that rule's limitation as to crimes older than ten years, which request the Court granted.
Mississippi Rule of Evidence 609(a) and (b) and part of the comment thereto read as follows:
Rule 609. IMPEACHMENT BY EVIDENCE OF CONVICTION OF CRIME
(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under *586 the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment.
(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.
... .
Comment
... .
The phrase "dishonesty or false statement" in 609(a)(2) means crimes such as perjury or subornation of perjury, false statement, fraud, embezzlement, false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.
The admission of prior convictions involving dishonesty or false statement is not within the discretion of the court. Such convictions are peculiarly probative of credibility and are always to be admitted.
... .
Subsection (b) imposes a time limitation on prior convictions. If the conviction occurred more than ten years earlier, it may not be used as impeachment evidence. The rationale underlying subsection (b) is based on fairness. A person's past should not be able to haunt him for the duration of his life. The judge may grant an exception in instances where the probativeness of the conviction substantially outweighs the prejudice. But, before the judge makes such a decision, the proponent must give the adversary sufficient notice so that the adversary may challenge the decision.
Prior to the rules Mississippi had no time limitation regarding prior convictions. The courts held only that the prior conviction should not be too remote in time from the case at bar. That principle obviously left a great deal of discretion with the trial judge in determining remoteness. Thus, the appellate court often upheld the use of prior convictions for impeachment which were far in excess of the ten year limitation of Rule 609(b).
... .
The defense asserted its intention to cross-examine the witnesses for impeachment purposes concerning those convictions occurring more than ten years before. As to Rule 609's requirement of written notice, the defense stated that the State already knew of defense counsel's intention because the State had furnished the defendant with the information and there had been a previous trial in the case. Defense counsel then asserted that the prior convictions were admissible under Rule 609(a)(2) as crimes involving dishonesty or false statements. The trial court refused to allow the introduction of prior convictions occurring more than ten years ago.
On cross-examination, Hill admitted that he had been convicted of crimes since 1976. On redirect, Hill stated that the crime was a 1985 conviction for possession of untaxed whiskey. Amison testified that he had been convicted of manufacture, possession and transportation of untaxed liquor in 1985. Numerous convictions of Hill for possession or transportation of untaxed liquor were excluded, and numerous convictions *587 of Amison for manufacture, possession and transportation of untaxed liquor were excluded.
Several questions are now examined. First, is the manufacture, possession or transportation of untaxed liquor a crime involving dishonesty or false statement under Rule 609(a)(2)? The case involving the conviction most similar to the one at bar was decided under identical Federal Rule of Evidence 609(a)(2). The second circuit held that a conviction for possession and transportation of untaxed cigarettes was not unrelated to veracity, and hence was admissible under the rule. The court stated that "a crime which involves defrauding the revenue stands high in the category of crimes affecting veracity." United States v. Apuzzo, 555 F.2d 306, 307-8 (2d Cir.1977) cert. denied, 435 U.S. 916, 98 S.Ct. 1470, 55 L.Ed.2d 507 (1978). Furthermore, an Arizona court held that a conviction for tax evasion (failure to pay city sales taxes) involves dishonesty and false statement under Arizona Rule of Evidence 609(a)(2). Blankinship v. Duarte, 137 Ariz. 217, 669 P.2d 994, 996 (Ariz. App. 1983). Blankinship cited United States v. Gellman, 677 F.2d 65 (11th Cir.1982), which held that the federal crime of failing to file a federal income tax return is sufficiently reprehensible to meet the exception of Rule 609(a)(2). Id. at 66. Gellman quoted Zukowski v. Dunton, 650 F.2d 30 (4th Cir.1981), with the same holding as to "willfully failing to provide information for income tax purposes." Id. at 34. This Court holds that the manufacture, possession or transportation of untaxed liquor is a crime involving dishonesty or false statement under Rule 609(a)(2).
The second question is whether a 609(a)(2) conviction is limited by Rule 609(b). The use of any conviction is subject to the time limits of Rule 609(b). McCormick on Evidence § 43 (3d Ed. 1984). The seventh circuit has held that a trial court has "no discretion to prevent introduction, for impeachment purposes, of evidence of prior convictions for crimes involving dishonesty or false statements, subject only to the ten-year time limit embodied in rule 609(b)." United States v. Kuecker, 740 F.2d 496, 502 (7th Cir.1984) (Emphasis added). The ninth circuit has held that if a prior conviction which falls within Rule 609(b)(2) is not more than ten years old within the meaning of Rule 609(b), it is admissible. United States v. McClintock, 748 F.2d 1278, 1288 (9th Cir.1984), cert. denied, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985). See United States v. Dixon, 547 F.2d 1079, 1083 (9th Cir.1976); United States v. Hans, 738 F.2d 88, 93 (3rd Cir.1984).
The third question is whether the lack of advance written notice precludes the defendant's use of the prior convictions older than ten years. By the express terms of the rule, a criminal defendant is not exempt from the requirement of appropriate notice. See United States v. Word, 806 F.2d 658, 666 (6th Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987). Knowledge by the State through the prior trial is particularly inapplicable in this case because the prior trial was conducted before the new Rules of Evidence went into effect. In fact, it is interesting to note that one conviction for carrying a concealed weapon, less than ten years old, was not offered by the defense.
Finally, what is the effect of the failure of the defense to make a balancing argument under Rule 609(b)? The federal courts generally agree that a rebuttable presumption exists against the use of prior crime impeachment evidence over ten years old and that such convictions will be admitted very rarely and only in exceptional circumstances. U.S. v. Tisdale, 817 F.2d 1552, 1555 (11th Cir.1987); United States v. Cathey, 591 F.2d 268, 275 (5th Cir.1979); United States v. Singer, 660 F.2d 1295, 1300 (8th Cir.1981), cert. denied, 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982). Indeed, even under Rule 609(a)(1), which places a lesser burden upon the proponent, evidence of the crime is not admissible without a finding of the probative value thereof, in order to determine whether the probative value outweighs its prejudicial effect. Ivy v. State, 522 So.2d 740 (Miss. 1988); Peterson v. State, 518 So.2d 632 *588 (Miss. 1987). Even if advance notice was given and a balancing argument made by the defendant, it can hardly be said that the circuit judge was in error when the probative value of the overage convictions has been so decreased by the previous impeachment with the same type crime. See Tisdale, 817 F.2d at 1555; Cathey, 591 F.2d at 277.
Johnson asserts that the trial court's exclusion of convictions of over ten years age as to these two witnesses was highly prejudicial to him. He emphasizes the importance of their testimony against him. Important as the testimony might have been, Johnson overlooks the fact that there was other important evidence, such as the identification testimony of Harris and Smith and the testimony of the fingerprint expert.
It is this Court's opinion that this assignment of error is without merit and that the trial court's ruling was in accord with Miss. R.Evid. 609(a) and (b).

V.

DID THE TRIAL COURT ERR IN DENYING THE APPELLANT'S MOTION FOR FUNDS TO EMPLOY AN INDEPENDENT FINGERPRINT EXPERT?
This assignment is based upon Johnson's federal constitutional claim to the due process guarantee of a fundamentally fair trial. It is grounded in the Fourteenth Amendment, to-wit:
[N]or shall any State deprive any person of life, liberty, or property, without due process of law....
The United States Supreme Court has "recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must ... assure that the defendant has a fair opportunity to present his defense." Ake v. Oklahoma, 470 U.S. 68, 76, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53, 61 (1985). See, e.g., Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (a trial transcript must be provided to an indigent defendant if necessary to a decision on merits); Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959) (no fee can be required of an indigent defendant before filing appeal of his conviction); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (indigent defendant is entitled to counsel at trial); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (legal assistance must be effective); Ake v. Oklahoma, supra (where sanity at the time of the offense is likely to be a significant factor at trial, due process requires the State to provide access to a psychiatrist's assistance to indigent defendant). Thus, Johnson asserts that Ake, supra, is the authority for his being provided funds for an expert witness in fingerprinting at State expense.
This same motion was made in Johnson I. At the first trial, Johnson filed a motion for funds to employ an independent fingerprint expert. Johnson asserted that the State had numerous resources, that certain fingerprints had been examined by experts of the State Crime Lab, that an untrained person cannot determine whether two fingerprints are the same, that the defendant is indigent, that to deny the motion would be to deny him due process, that only an expert can determine the identity or lack of identity of fingerprints and that Sam Ivy, a fingerprint expert in Jackson, would conduct the independent fingerprint examination for the defendant for an anticipated fee of $100.
The parties stipulated that various individuals, including Ron Smith, fingerprint expert, are all forensic scientists or employees employed by the Mississippi State Crime Lab in Jackson, have participated in, to the extent revealed by discovery reports, and are participating in, the investigation, examination and evaluation of evidence in the case, that their salaries are paid by the state and that their services are only available to law enforcement agencies in the state.
The motion was overruled. The defendant orally renewed the motion twice, and the Court twice refused to change its ruling.
Ron Smith, the fingerprint examiner with the Mississippi Crime Lab, was the only *589 fingerprint expert to testify at the first trial. He testified that a fingerprint found on a door facing inside the Super Stop was the appellant's fingerprint. Johnson I, 476 So.2d at 1200. This Court's first opinion also states that Smith testified that a red substance found on the print was blood, but he was unable to determine the type. It was not Smith who so testified. Instead, it was Larry Turner, a forensic serologist with the Mississippi Crime Lab. However, Ron Smith did testify that due to the manner the blood was on the ridges of the fingerprints, he was able to determine that the blood had been on appellant's hand when he touched the door facing, rather than the blood having been on the door facing when the appellant put his hand on it. Smith was not able to determine when the print was made. Id.
At the second trial, Johnson again filed a motion for funds to employ an independent fingerprint expert. In that motion, Johnson did not give the name and anticipated fee of a fingerprint expert, but rather stated that he would submit to the court the name of a fingerprint expert and the expert's anticipated fee. Defense counsel later orally submitted the name of a retired fingerprint clerk with thirty year in the FBI, John L. Puddister, and stated that the fee would be $25.00 an hour, plus out-of-pocket expenses, including mileage, etc. The court at that time denied funds for such expert.
Johnson then filed another motion for authority to employ an independent fingerprint expert and alternative relief. This time, defense counsel added assertions that fingerprints had been examined by the FBI and that he had been advised that the district attorney planned to call a fingerprint specialist, Leroy Walton, with the Federal Bureau of Investigation Laboratory in Washington, D.C. as a witness in the case. The court denied the motion orally. The court also overruled the motion for funds to employ an independent expert by written order.
At the second trial, the testimony of Ron Smith was basically the same as at the first trial except that he did not identify to whom the latent print belonged. Rather, he testified of his delivery of the print to the Federal Bureau of Investigation in Washington, D.C. Walton, a supervisor fingerprint specialist with the FBI, who had worked in the field for 30 and 1/2 years, testified that the print found on the door facing at the Super Stop was the same as the inked print given him and identified as Leon Johnson. Interestingly, he was not asked, nor did he testify, concerning the prior presence of the reddish substance on the finger.
In Johnson I, this Court noted that on this very issue, the U.S. Supreme Court left undisturbed this Court's holding that the Constitution does not require a state to furnish an indigent defendant with expert or investigative assistance upon demand. 476 So.2d at 1202 [citing Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)]. This Court did recognize that the doctrine of fundamental fairness, guaranteed by the due process clause, at times requires authorization for appointment of a particular expert or investigator. Id. This Court quoted Ruffin v. State, 447 So.2d 113, 118 (Miss. 1984), as follows:
"There is no merit in this assignment of error. That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare. See: U.S. v. Baldi, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1952); U.S. v. Pennsylvania, 452 F.2d 557 (3rd Cir.1971); Aldisert, C.J., p. 563; State v. Grant, 560 S.W.2d 384 (Mo. App. 1977); Graham v. State, 547 S.W.2d 531 (Tenn. 1977); and State v. Montgomery, 291 N.C. 91, 229 S.E.2d 572 (N.C. 1976).
"As aptly stated in Oregon v. Acosta, 41 Or. App. 257, 597 P.2d 1282, 1284 (1979):
It is apparent that an indigent's statutorily enacted right to defense expenses is not absolute, but is conditioned upon a showing that such expenses are needed to prepare and *590 present an adequate defense. (Citations omitted) Neither the statute nor the constitutional guarantees of effective assistance of counsel and of equal protection require that an investigator or expert be furnished at public expense upon demand.
(Citations omitted) There is no single test for determining whether the services of an investigator or an expert are necessary; that decision will depend on the facts and circumstances of the particular case and must be committed to the sound discretion of the court to which the request for expenses is directed. (Citations omitted) [Emphasis added.]"
476 So.2d at 1202-1203. This Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair. Id. at 1203. This Court held that in the first trial, the lower court did not abuse its discretion in declining to provide the requested experts because the record reflected that defense counsel had full access to the State's experts, together with their reports, counsel were able to subject to them to rigid cross-examination and there was nothing to indicate that the State experts were biased or incompetent. These reasons apply equally to the second trial. It was this Court's opinion that Johnson was not prejudiced in Johnson I for failure of the lower court to provide him funds with which to obtain his own experts, nor did he suffer any disadvantage thereby. Id.
In 1985, the U.S. Supreme Court held "that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one." Ake v. Oklahoma, 470 U.S. 68, 74, 105 S.Ct. 1087, 1091, 84 L.Ed.2d 53, 60 (1985). The Court examined the private interests that would be affected by the action of the State, which it found to be almost uniquely compelling. The Court next examined the governmental interests that would be affected if the safeguard is to be provided, which it found was not substantial. Finally, the Court examined the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. Id. at 77-79, 105 S.Ct. at 1093-1094, 84 L.Ed.2d at 62-64. The Court concluded that without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, the risk of an inaccurate resolution of sanity issues is extremely high. Id. at 82, 105 S.Ct. at 1095, 84 L.Ed.2d at 65.
Shortly after the Ake decision, the U.S. Supreme Court stated the following in a footnote:
Petitioner also raises a challenge to his conviction, arguing that there was constitutional infirmity in the trial court's refusal to appoint various experts and investigators to assist him. Mississippi law provides a mechanism for state appointment of expert assistance, and in this case the State did provide expert psychiatric assistance to Caldwell at state expense. But petitioner also requested appointment of a criminal investigator, a fingerprint expert, and a ballistics expert, and those requests were denied. The State Supreme Court affirmed the denials because the requests were accompanied by no showing as to their reasonableness. For example, the defendant's request for a ballistics expert included little more than "the general statement that the requested expert `would be of great necessarius witness.'" 443 So.2d 806, 812 (1983). Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision. Cf. Ake v. Oklahoma, 470 U.S. 68, 82-83, 84 L.Ed.2d 53, 105 S.Ct. 1087 [1095-1096] (1985) (discussing *591 showing that would entitle defendant to psychiatric assistance as matter of federal constitutional law). We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought.
Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231, 236 n. 1 (1985).
In 1987, the Eleventh Circuit stated that the implication in Caldwell that the Government's refusal to provide non-psychiatric expert assistance could, in a given case, deny a defendant a fair trial is questionable in light of the Court's subsequent statement that it had no need to determine as a matter of federal constitutional law what, if any, showing would entitle a defendant to assistance of the type sought. Moore v. Kemp, 809 F.2d 702, 711 (11th Cir.1987).
One recent case involving the refusal to grant funds to employ a fingerprint expert distinguished Ake, stating that the rationale in that case "was that if those in need of psychiatric assistance were deprived of such assistance, there would be an extremely high risk of inaccuracy in resolving the issues of sanity." Woodard v. State, 743 P.2d 662, 664 (Okla.Cr.App. 1987). The Court believed that the same level of risk was not present in the area of fingerprint evidence. In Woodard, the fingerprint expert related to the jury how he correlated the latent fingerprints taken from the automobile to the appellant, after which defense counsel attacked these conclusions with extensive cross-examination, after which the jury determined there was justification for this conclusion. Therefore, the Court could not say that the appellant was denied the "basic tools" of his defense. Id.
In a very recent case, the Supreme Court of North Carolina held that the question of whether the defendant should have been provided with the assistance of a fingerprint expert was controlled by Ake. The Court stated that indigent defendants are required to meet the flexible requirement of a threshold showing of specific need for the expert sought. The Court reversed the conviction for the failure to provide funds for a fingerprint expert, relying upon the fact that the victim could not identify her assailant, so that the determination of guilt or innocence hinged largely on the unrebutted testimony of the State's fingerprint expert, and the fact that the fingerprint expert would enable defense counsel to access more accurately the one item of hard evidence implicating him in the crimes charged. State v. Moore, 321 N.C. 327, 364 S.E.2d 648, 656-58 (1988). However, a concurrence stated that the Court's holding would require appointment of fingerprint experts in almost all cases in which fingerprint evidence is introduced by the State and certainly in those cases where the State relies upon fingerprint evidence and there were no eyewitnesses to the crime charged. The concurrence also stated that the type of expertise involved in analyzing fingerprints is a far cry from that employed by psychiatrists since the taking and analysis is largely a mechanical function, readily demonstrable to a jury, whereas the issue of sanity is one about which experts can and frequently disagree so that it was easy in Ake for the U.S. Supreme Court to conclude that the defendant could not properly prepare his defense without the assistance of an expert in the field of psychiatry. Id. (concurring opinion).
The principles outlined in Johnson I were affirmed in Burt v. State, 493 So.2d 1325, 1326-27 (Miss. 1986). Note too that certain requirements of specificity in the motion are present, such as the name and specific cost for the expert and the purpose and value of such an individual to the defense. Bullock v. State, 391 So.2d 601, 607 (Miss. 1980); Tubbs v. State, 402 So.2d 830, 836 (Miss. 1981). See Davis v. State, 374 So.2d 1293, 1297 (Miss. 1979); Dufour v. State, 453 So.2d 337, 340-341 (Miss. 1984). This Court has considered as a factor whether the State's case depends almost entirely upon the identification of the defendant's fingerprints, that is, whether the determination of guilt or innocence of the defendant is dependent on the State's expert witness. Tubbs, 402 So.2d at 836; Davis, 374 So.2d at 1297.
*592 Although recognizing the important implications both to the State and the defendant on this issue, this Court holds that there was not such a high risk of inaccuracy in fingerprint evidence as to determine in this case that the defendant was denied a fundamentally fair trial. This is not to say, however, that given another set of facts and circumstances that an accused should not be afforded at State expense an independent expert witness.
Finding no error requiring reversal, this Court affirms the conviction of Leon Johnson for murder and sentence to life imprisonment.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
DAN M. LEE, P.J., and ROBERTSON and SULLIVAN, JJ., concur in parts I, II, III, and IV and dissent as to part V.
DAN M. LEE, Presiding Justice, dissenting:
While I join today's majority opinion as to all other issues, I respectfully dissent as to this Court's affirmance of the lower court's denial of Johnson's motion for funds to employ an independent fingerprint expert.
Johnson, an indigent, made a motion in the trial court for funds to employ a fingerprint expert. The state presented testimony and evidence which was subject to ample contradiction. The witness who initially summoned police testified emphatically that Johnson was not at the scene of the crime. Additionally, it was conclusively shown that the decedent had been raped, but that the semen recovered from her vaginal tract came from a person with type B blood, secretor status. Johnson has type AB, secretor status, and, therefore, the semen was not Johnson's. Thirteen latent fingerprints were lifted from the crime scene; only eight were identified. Only one of those was identified by the State Crime Lab as Johnson's, found on a door facing inside the Super Stop. A red substance found on the print was identified as blood, but the blood type was unidentifiable. Also, the State Crime Lab could not determine when the print was made, a fact significant in that Johnson admitted stopping in this particular Super Stop four days before the incident occurred. In light of the absence of any other uncontradicted and conclusive evidence, this virtually unopposed fingerprint testimony offered by the state became the state's crucial evidence as to Johnson's possible guilt. The state was able to build its case against Johnson around this crucial fingerprint evidence by access to the investigative services of the Meridian Police Department, the Lauderdale County Sheriff's Department, various Alabama law enforcement agencies, the Mississippi Crime Laboratory, the FBI, and the investigator for the district attorney's office. Johnson, as an indigent, had to rely solely upon the investigative efforts of appointed defense counsel, counsel who had no training or experience in forensic investigation. Had Johnson not been indigent, defense counsel would have been constrained to hire such an expert. Johnson's indigence prohibited him from obtaining the assistance necessary to provide a fair trial. In circumstances such as these, where the case against Johnson turned upon the fingerprint evidence, I submit it is incumbent upon the lower court to grant an indigent defendant's motion for funds to hire an independent fingerprint expert in order to assure that the defendant is not deprived of due process of law guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and by § 14 of the Constitution of the State of Mississippi.
Although there is no constitutional mandate for the appointment of experts, Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985), such assistance is required when the denial of such funds caused the trial of the defendant to be fundamentally unfair, U.S. v. Patterson, 724 F.2d 1128 (5th Cir.1984), or where the area in which the expert is needed "is to be a significant factor at trial." Ake, 470 U.S. at 83, 105 S.Ct. at 1096. In Ake, the Supreme *593 Court of the United States reversed a conviction because of the trial court's refusal to provide expert psychiatric assistance after the issue of the defendant's sanity became the significant issue in the trial. According to the Court, "A criminal trial is fundamentally unfair if the state proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." Ake, 470 U.S. at 77, 105 S.Ct. at 1093. Although the Ake decision involved the appointment of psychiatric assistance, the Court intended that experts of all kinds should be made available to indigent defendants.
[W]hile this Court has not held that a state must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, Ross v. Moffitt, 417 U.S. 600 [94 S.Ct. 2437, 41 L.Ed.2d 341] (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to `an adequate opportunity to present their claims fairly within the adversary system.' Id. at 612 [94 S.Ct. at 2444]. To implement this principle, we have focused on identifying the `basic tools of an adequate defense or appeal,' Britt v. North Carolina, 404 U.S. 226, 227 [92 S.Ct. 431, 433, 30 L.Ed.2d 400] (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them.
Ake, 470 U.S. at 77, 105 S.Ct. at 1093. It seems, then, that Ake was intended to apply to all significant tools of a defense presented by the facts of a particular case. Overlying all of the foregoing discussion is the principle, as stated by Justice Black, "[t]here can be no equal justice where the kind of trial a [person] gets depends on the amount of money [s]he has." Griffin v. Illinois, 351 U.S. 12, 19, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956).
The United States Supreme Court noted that Mississippi has a legal scheme for providing expert assistance to indigent defendants. In Caldwell v. Mississippi, 472 U.S. 320, 323, n. 1, 105 S.Ct. 2633, 2637, n. 1, 86 L.Ed.2d 231 (1985), the United States Supreme Court left undisturbed this Court's holding that because Caldwell "offered little more than undeveloped assertions that the requested assistance would be beneficial" the trial judge committed no error in denying his motion for funds for a criminal investigator, a fingerprint expert, and ballistics expert. Thus, we turn to state law.
The law in Mississippi provides that there are instances where fairness dictates that the state should provide an indigent defendant with the funds necessary to employ an expert; such cases are to be within the trial court's discretion. Ruffin v. State, 447 So.2d 113, 118 (Miss. 1984). This discretion is to be applied on a case-by-case basis. Dufour v. State, 453 So.2d 337, 341 (Miss. 1984); Davis v. State, 374 So.2d 1293 (Miss. 1979). Where the trial court has abused its discretion by denying an indigent's request for the funding of expert assistance, when such assistance is necessary for the preparation of an adequate defense, the denial violates the guarantee of due process of law and creates a fundamentally unfair trial. See, e.g., United States v. Patterson, 724 F.2d 1128 (5th Cir.1984).
According to Mississippi case law, in determining on a case-by-case basis the appropriateness of supplying expert assistance, specifics must be shown to the trial court as to the purposes to be served by the proposed expert witness, the cost of such a witness, and the value of that expert to the defense. Dufour v. State, 453 So.2d 337 (Miss. 1984); Tubbs v. State, 402 So.2d 830 (Miss. 1981); Bullock v. State, 391 So.2d 601 (Miss. 1980); Davis v. State, 374 So.2d 1293 (Miss. 1979). Here, Johnson offered the name of a specific fingerprint expert, the amount of fees for his services, and the specific purpose for which Johnson needed his services. The value of this fingerprint expert to Johnson's defense, as discussed above, can readily be distinguished from our cases upholding denial of such assistance. For example, in Davis v. State, 374 So.2d 1293 (Miss. 1979), this Court upheld denial of a handwriting expert because "the guilt or innocence of the defendant was scarcely, if at all, dependent *594 upon the state's expert witness... ." Id. at 1297. Such is not the case with Johnson, where his guilt or innocence crucially turned on the state's fingerprint expert. In Ruffin v. State, 447 So.2d 113 (Miss. 1984), this Court upheld denial of a forensics expert because "the evidence of which he attempts to complain on appeal was admitted by stipulation and without objection." Id. at 118. Such is certainly not the case with Johnson. In Tubbs v. State, 402 So.2d 830 (Miss. 1981), we upheld denial of a fingerprint expert on two bases: the state presented a strong case by other evidence which would have been sufficient to uphold the jury verdict even if the fingerprint testimony had been omitted; and, defense counsel did not submit the name of a proposed expert to the lower court upon its request. Id. at 836. Neither of these reasons applies to Johnson; the state's case against him without the fingerprint evidence was weak, and Johnson supplied the specifics about his proposed expert to the trial court. In Bullock v. State, 391 So.2d 601 (Miss. 1981), we upheld denial of funds for an independent pathologist because the defendant did not submit the required specifics to the trial court. Id. at 607. Again, Johnson supplied the required specifics to the trial court. In Dufour v. State, 453 So.2d 337 (Miss. 1984), we upheld denial of funds for an independent investigator because the specific necessity for one was not submitted to the trial court. Id. at 340. Johnson supplied the specific need for a fingerprint expert. Under our own case law, then, Johnson meets the criteria for the granting of a motion for funds for a fingerprint expert, and the trial court abused its discretion when it denied his motion.
Federal courts have interpreted the Criminal Justice Act of 1964, 18 U.S.C. § 3006A(e)(1) as requiring the provision of an expert. This statute has been applied in a manner similar to the Mississippi concept, "The majority of state and federal jurisdictions express a similar view," Johnson v. State, 476 So.2d 1195, 1203 (Miss. 1985). Once the defendant has been ruled an indigent, the court must determine if the defendant is "unable to obtain investigative, expert or other services necessary to an adequate defense." 18 U.S.C. § 3006A(e)(1). Upon the court's finding that such service is necessary, it "shall authorize counsel to obtain the services." Id.
Two federal cases have determined that the availability of such assistance was necessary to insure the indigent defendant a fair trial. The facts presented in both cases are remarkably similar to those presented in Johnson's case. In United States v. Durant, 545 F.2d 823 (2d Cir.1976), the testimony of witnesses was conflicting, and the principle evidence was a partial thumbprint at the scene of an armed robbery. The prosecution resisted the defense motion for a fingerprint expert, stating that the defendant had cross-examined the government's fingerprint expert, and that it was "ludicrous that the government should pay for a second expert." Id. at 825. The trial court agreed and directed the defense to cross-examine the government's expert. Id. The Second Circuit noted that, although applications for expert assistance should not be granted automatically, the rule "must not be emasculated by niggardly or inappropriate construction," Id. at 827, and that "excessive rigidity in considering such a request is not the rule." Id. at 828-29.
The Court went on, "[w]here the identification of the defendant as a culprit is contested, fingerprint evidence is likely to be pivotal. This was such a case. Both counsel in summation emphasized the fingerprint evidence. But defense counsel had to get along without his own expert." Id. at 828. The Durant Court discussed the importance of such expert assistance:
Had one been authorized, counsel might have been able to make several challenges. Since the latent print was only a partial print and blurred, an expert could have advised whether it was possible to make any identification at all from it. Moreover, eminent fingerprint authority indicates that there may be `some cases' in which `a difference of opinion can arise' regarding the identity of even more discernable prints. [footnote omitted] Also, another expert may well have *595 thought that the number of identical characteristics required for concluding that two prints were the same were greater than the fourteen [the government's expert] testified to, or that some of the fourteen were not identical. At the very least, an expert could have educated defense counsel as to the technicalities of the field to make cross-examination more effective.

Id. at 828 [emphasis added].
In United States v. Patterson, 724 F.2d 1128 (5th Cir.1984), the Fifth Circuit relied heavily upon the Durant case and United States v. Theriault, 440 F.2d 713 (5th Cir.1971) (which involved the requirement of providing psychiatric expertise to the defendant). In Patterson, the defendant's motion for a fingerprint expert was denied, but the prosecution had three witnesses to testify as to the fingerprint evidence, which it claimed was pivotal. The Fifth Circuit expressed the following:
Where the government's case rests heavily on a theory most competently addressed by expert testimony, an indigent defendant must be afforded the opportunity to prepare and present his defense to such a theory with the assistance of his own expert pursuant to § 3006A(e). This view is consistent with Bradford v. United States, 413 F.2d 467 (5th Cir.1969), in which we established that where the government's case is heavily dependent on evidence with regard to which a government expert testifies and the defendant has been denied the appointment of an expert, such evidence is sufficiently crucial to the government's theory that denial of a defense expert constitutes reversible error.

Patterson, 724 F.2d at 1130 [emphasis added]. The Fifth Circuit also rejected the government's argument that Bradford and Durant were distinguishable. The government claimed that, unlike those cases, the fingerprint evidence in Patterson was not pivotal to the prosecution, and that other evidence was sufficient for the jury to find the defendant guilty beyond a reasonable doubt. The Court declared that
[T]he absence of [any contradiction of the fingerprint] evidence may merely have been the result of Patterson's inability to explore the area of fingerprints without the help of his own expert. It is entirely possible that another expert might have reached a different result in comparing the latent print and Patterson's print. Moreover, the assistance of an expert undoubtedly would have facilitated Patterson's cross-examination of the government's expert.
Patterson, 724 F.2d at 1131. Concluding, the Court added that "we think it is clear that the lack of an expert hampered Patterson's ability to prepare and present an adequate defense. We are unwilling to say that such a handicap was not prejudicial." Id.
In the case before us today, Johnson's guilt or innocence was judged by the jury on the basis of virtually unopposed fingerprint identification offered by the state. In my opinion, the trial court abused its discretion when it denied Johnson's motion for funds to hire a fingerprint expert. Johnson met the criteria of our own state law for granting such a motion, and the value of such expert assistance to Johnson's defense can hardly be questioned, especially in light of the decisions of two federal courts on the same issue.
Therefore, I would reverse and remand this case for a new trial.
ROBERTSON and SULLIVAN, JJ., join this dissent.